NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5829-13T1
 A-2813-14T1

NANCY G. SLUTSKY,

 Plaintiff-Respondent/ APPROVED FOR PUBLICATION
 Cross-Appellant,
v. August 8, 2017

 APPELLATE DIVISION
KENNETH J. SLUTSKY,

 Defendant-Appellant/
 Cross-Respondent.
_______________________________

NANCY G. SLUTSKY,

 Plaintiff-Respondent,

v.

KENNETH J. SLUTSKY,

 Defendant-Appellant.
________________________

DONAHUE, HAGAN, KLEIN &
WEISBERG, LLC,

 Respondent.
_______________________________

 Argued December 1, 2016 - Decided August 8, 2017

 Before Judges Lihotz, Hoffman and Whipple.

 On appeal from Superior Court of New Jersey,
 Chancery Division, Family Part, Morris
 County, Docket No. FM-14-1535-08.
 Edward S. Snyder argued the cause for
 appellant/cross-respondent in A-5829-13 and
 appellant in A-2813-14 (Snyder, Sarno,
 D'Aniello, Maceri & DaCosta, LLC, attorneys;
 Mr. Snyder, of counsel and on the briefs;
 Scott D. Danaher, on the briefs).

 Ronald M. Abramson argued the cause for
 respondent/cross-appellant in A-5829-13
 (Winne, Banta, Basralian & Kahn, PC,
 attorneys; Mr. Abramson, of counsel and on
 the brief).

 Donahue, Hagan, Klein & Weisberg, LLC, pro
 se respondent in A-2813-14 (Francis W.
 Donahue, of counsel and on the brief).

 The opinion of the court was delivered by

LIHOTZ, P.J.A.D.

 These two appeals arise from the parties' matrimonial

litigation. The court scheduled the matters back-to-back before

the same panel to address all issues in a single opinion.

 In Docket No. A-5829-13, defendant Kenneth J. Slutsky

appeals from a May 30, 2014 final judgment of divorce (final

judgment). He challenges various aspects of final judgment;

most significantly, the rejection of evidence regarding the need

to repay family loans and the valuation and equitable

distribution of his interest as an equity partner in a large New

Jersey law firm. Additionally, defendant appeals from the

ordered equitable distribution of what he asserts were

premarital IRAs and the awarded counsel fees and expert costs to

plaintiff Nancy Slutsky. Defendant further challenges a July

 2 A-5829-13T1
28, 2014 order denying his motion for reconsideration, and a

second order filed the same date, which implemented a payment

schedule for the ordered amount of equitable distribution and

fees.

 Plaintiff cross-appeals, challenging the final judgment and

the July 28, 2014 orders. She argues the judge improperly

denied her claim for financial adjustments to account for

insufficient pendente lite support, and maintains the trial

judge abused his discretion in not ordering defendant to satisfy

the entirety of her counsel fees and expert costs, by allowing

defendant to satisfy ordered obligations over time.

 In the second matter, Docket No. A-2813-14, defendant

appeals from a January 9, 2015 order denying his motion to

dismiss for lack of standing, a petition filed by plaintiff's

former counsel to enforce the order mandating defendant remit

payment to satisfy obligations owed to plaintiff. Defendant

argues counsel no longer represented plaintiff in the

application, making counsel adverse to her interests.

 Before this court, defendant moved to supplement the record

with subsequent orders relating to the amount of plaintiff's

counsel fee obligation. The reviewing motion panel deferred the

matter for consideration in this opinion. We grant the motion.

 3 A-5829-13T1
 For the reasons discussed in our opinion, we affirm the

order rejecting defendant's request to require plaintiff to

contribute to the repayment of monies transferred from various

family trusts; we reverse the evaluation of the goodwill

attached to defendant's interest in his law firm, as well as the

percentage interest in this asset, granted to plaintiff; we

reverse the July 28, 2014 order subjecting defendant's Union

Central and Wells Fargo IRAs to equitable distribution; we

reverse the award of counsel fees, but affirm defendant's

ordered payment of expert costs. Additionally, we affirm the

final judgment provision denying plaintiff's request for an

allocation of additional support based on the pendente lite

award and reject as unavailing her claim for an award of

additional attorney's fees.

 Because various provisions in the final judgment are

vacated, the order under review in A-2813-14 is reversed. The

matter must be reviewed on remand by a different Family Part

judge.

 I.

 After thirty years of marriage, plaintiff filed a complaint

for dissolution of the parties' marriage and review of her

related requests for alimony, equitable distribution, and

satisfaction of debts, counsel fees, and costs. The litigation

 4 A-5829-13T1
was difficult and protracted. Some delays in the final

disposition occurred from June 2009 to April 2013, to abide the

conclusion of a guardianship proceeding and another delay

resulted in 2011, to accommodate one party's medical concerns.

Ultimately, trial commenced on January 6, 2014, and was

conducted over nineteen days. The judge issued a written

opinion, addressing all disputed issues. Final judgment was

filed on May 30, 2014.

 Post-trial cross-motions sought to modify certain

provisions of the final judgment and the judge issued an amended

final judgment, correcting clerical errors. On the same date,

two other orders were filed. These orders effectuated

provisions of the amended final judgment, and included a payment

schedule for defendant's satisfaction of the ordered

obligations. Motion practice continued. Subsequent orders

denied defendant's request to stay pending appeal the financial

obligations set forth in the final judgment; denied defendant's

request for additional findings of fact and conclusions of law;

and granted a limited stay to allow defendant to request this

court stay execution of the amended final judgment. We denied

defendant's stay motion.

 The parties challenged various provisions of the final

judgment arguing the judge's insufficient factual findings could

 5 A-5829-13T1
not sustain the legal conclusions reached, and contended legal

error and abuse of discretion require reversal. We recite the

well-settled standards guiding our review of Family Part orders

and judgments.

 In our review of a non-jury trial, we defer to a trial

judge's factfinding "when supported by adequate, substantial,

credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998).

We also note proper factfinding in divorce litigation involves

the Family Part's "special jurisdiction and expertise in family

matters," which often requires the exercise of reasoned

discretion. Id. at 413. In our review, "[w]e do not weigh the

evidence, assess the credibility of witnesses, or make

conclusions about the evidence." Mountain Hill, LLC v. Twp. of

Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008)

(alteration in original) (quoting State v. Barone, 147 N.J. 599,

615 (1997)), certif. denied, 199 N.J. 129 (2009). Consequently,

when this court concludes there is satisfactory evidentiary

support for the trial court's findings, "its task is complete

and it should not disturb the result." Beck v. Beck, 86 N.J.

480, 496 (1981) (quoting State v. Johnson, 42 N.J. 146, 161-62

(1964)).

 In bench trials, our "[d]eference is especially appropriate

when the evidence is largely testimonial and involves questions

 6 A-5829-13T1
of credibility." Cesare, supra, 154 N.J. at 412 (quoting In re

Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). We

recognize a trial judge who observes witnesses and listens to

their testimony, develops "a feel of the case" and is in the

best position to "make first-hand credibility judgments about

the witnesses who appear on the stand." N.J. Div. of Youth &

Family Servs. v. E.P., 196 N.J. 88, 104 (2008). In contrast,

review of the cold record on appeal "can never adequately convey

the actual happenings in a courtroom." N.J. Div. of Youth &

Family Servs. v. F.M., 211 N.J. 420, 448 (2012).

 Reversal is warranted when the trial court's factual

findings are "so manifestly unsupported by or inconsistent with

the competent, relevant and reasonably credible evidence as to

offend the interests of justice." Rova Farms Resort, Inc. v.

Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974) (quoting

Fagliarone v. Twp. of N. Bergen, 78 N.J. Super. 154, 155 (App.

Div.), certif. denied, 40 N.J. 221 (1963)). All "legal

conclusions, and the application of those conclusions to the

facts, are subject to our plenary review." Reese v. Weis, 430

N.J. Super. 552, 568 (App. Div. 2013).

 In this matter, the trial judge issued a written opinion,

identified the undisputed facts, related aspects of expert

testimony, and stated his conclusions. Noting not all decisions

 7 A-5829-13T1
set forth in the final judgment are challenged on appeal, we

limit our discussion to facts underlying discrete challenges,

which we include in the discussion of each individual issue.

 II.

 We start with the nine issues raised by defendant on

appeal. Where appropriate, we have combined arguments directed

to similar matters.

 A.

 Initially, defendant argues he was denied a fair trial

because plaintiff engaged in "willful, contumacious behavior

that made a mockery of justice," for which the judge declined to

sanction her. Defendant contends, "no reported case in New

Jersey has recited facts demonstrating more of an affront to the

justice system than the actions of this plaintiff" during the

pendency of this case. Review of defendant's argument recites

plaintiff's obstreperous behavior "effectively precluded [him]

from cross-examining plaintiff . . . the key witness on the

issue of family loans." Defendant maintains the judge should

have sanctioned plaintiff, followed through on his threats to

strike her pleadings, and, at the very least, draw an adverse

inference on the loan issue "instead of placating plaintiff" and

treating her in a solicitous manner. Defendant's argument in

Point I strikes only at his request to equitably allocate monies

 8 A-5829-13T1
borrowed from several family trusts; a related issue is raised

in Point V.

 Defendant testified regarding the nature and amount of the

loans from various family trusts. He explained plaintiff's

spending resulted in a "tsunami" of credit card debt, which

could only be met by borrowing, and asserted approximately $1.9

million was loaned by the trusts to maintain the marital

lifestyle, between the years 1987 and 2008. When received, the

monies were deposited into a joint account with plaintiff and

all must be repaid. The trustees did not intervene in the

litigation to seek repayment.

 Admitted into evidence was a "revolving promissory note,"

dated June 15, 1998, executed by defendant and issued to the

June Slutsky Trust. June Slutsky is defendant's mother and this

testamentary trust was created by her mother, Rose Gross. The

trust granted a lifetime interest to June and her sisters. The

remainder of June's interest passes to defendant. The note

contained a grid of blank boxes, which were to be completed with

amounts borrowed on stated dates. A similar note, also dated

June 15, 1998, was executed by defendant to borrow money from a

credit shelter trust established by his late father. 1 June

Slutsky was the sole trustee and defendant held her power of

1
 The notes were not included in the appendix on appeal.

 9 A-5829-13T1
attorney. The third trust was an inter vivos insurance trust.

The insurance policy pays a death benefit to the named

beneficiary, defendant, upon the death of both insureds,

defendant's parents. Defendant is the trustee and borrowed

against the cash value of the insurance policy. There was no

documentation for borrowings from the life insurance trust.

 Defendant testified he received permission for each trust

withdrawal and insisted he must repay the obligations.

Defendant's testimony differentiated these borrowed sums from

gifts made by June.

 In addition, defendant presented a legal pad containing his

and plaintiff's handwriting, which he explained was prepared

while they engaged in estate planning. Defendant urged

plaintiff falsely testified she knew nothing about the loans

because he told her each time he borrowed money and the notes

demonstrated her knowledge of the debts and the requirement for

repayment. The legal pad notes purportedly calculated

additional life insurance purchased to assure plaintiff's

financial security in the event defendant predeceased June, who

required the debts be repaid and essentially "pull the rug out

from her [plaintiff] right away."

 In her scattered testimony, plaintiff did not agree she

knew of the obligation for repayment of the monies borrowed.

 10 A-5829-13T1
She also denied understanding the debts were accounted for

during estate planning discussions. In fact, in the course of

her cross-examination on this subject, plaintiff was non-

responsive, ignored questions asked, as well as the judge's

instructions to answer "yes" or "no."

 Plaintiff's expert, Gary Phillips, analyzed the documents

and opined the facts raised risks these trust transfers

triggered tax consequences and would not be considered loans,

but rather a trust distribution to June, which were followed by

a gift to defendant. Phillips acknowledged the trustees of all

three trusts were empowered to engage in loans; however, he

stated the notes executed by defendant lacked an interest

component, the instruments' grids were not completed when

borrowings were made, so amounts stated on the notes were

significantly less than totals claimed by defendant. For

example, the June Slutsky Trust note reflected borrowing of

$56,000, yet defendant claimed the actual amount loaned was

$256,000; the credit shelter trust note reflected loans of

$275,500, yet defendant claimed $700,000 was borrowed. Phillips

further challenged the claimed loan status for all trust

borrowings because he found no record defendant made repayments.

 Plaintiff also presented de bene esse deposition testimony

of a bank loan officer responsible for reviewing documentation

 11 A-5829-13T1
submitted to obtain mortgage loans secured by the marital home.

The loan officer testified the family trust debts were not

disclosed on the loan applications completed by defendant and

plaintiff.

 On appeal, defendant asserts plaintiff's failure to respond

to questions regarding her handwritten notes, showing she

understood the debts, required the judge to draw an adverse

inference. He highlights plaintiff's extensive higher

education, which includes a bachelor's degree in economics from

an Ivy League institution, a master's degree in finance from New

York University, and certifications as a public accountant and a

financial planner, as belying her claims of ignorance and lack

of understanding. He also argues the judge erroneously

misapplied the law.

 "Generally speaking, in dividing marital assets the court

must take into account the liabilities as well as the assets of

the parties." Monte v. Monte, 212 N.J. Super. 557, 567 (App.

Div. 1986); see also N.J.S.A. 2A:34-23.1(m) (requiring "debts

and liabilities of the parties" to be considered when

determining equitable distribution). Where marital debts are

proven, courts should deduct marital debts from the total value

of the estate, or allocate the obligations between the parties.

See Pascarella v. Pascarella, 165 N.J. Super. 558, 563 (App.

 12 A-5829-13T1
Div. 1979) (holding the trial judge was required to deduct debt

incurred during the marriage between husband and his mother);

Ionno v. Ionno, 148 N.J. Super. 259, 262 (App. Div. 1977)

(holding obligations should be allocated between the husband and

wife).

 These matters are fact sensitive. When a particular debt

is claimed to be owed to a member of one spouse's family, the

burden of proof rests on the claiming spouse to establishing a

bona fide obligation to repay the monies asserted as loans.

Monte, supra, 212 N.J. Super. at 567-68.

 In Monte, the defendant questioned whether the loans to the

plaintiff's family were "bona fide." Id. at 568. This court

stated:

 Under these circumstances it would not be
 equitable to require [the] defendant to be
 charged with any portion of the loans if
 [the] plaintiff is not likewise required to
 pay. Moreover, absent a finding as to
 whether the debts to [the] plaintiff's
 relatives did or did not exist, it may be
 necessary for those relatives to establish
 the basis and amount of the debts.

 [Ibid.]

 Following review of the facts at hand, we are not persuaded

defendant suffered prejudice by plaintiff's non-responsiveness

during cross-examination or her disruptive behavior tolerated by

the trial judge warranted a new trial. We are hard-pressed to

 13 A-5829-13T1
criticize the trial judge's attempts to control the courtroom.

In hindsight, one reading the trial transcripts might suggest

things should have been done differently. However, we are not

convinced possible errors when dealing with plaintiff prevented

defendant from presenting his case.

 We understand defendant argues plaintiff's claimed lack of

understanding of family finances and estate planning is

incompatible with her extensive financial and tax educational

achievements. This may be true. In the trial judge's words,

plaintiff's testimony was scattered and, "tenuous at best." His

credibility findings imply some of plaintiff's conduct aligned

with her "fixed agenda," which included among other things

"'getting back' at [d]efendant." The judge further

characterized plaintiff as "belligerent" and "fixated."

 That said, we also cannot overlook plaintiff suffered

health and emotional problems. Early in the litigation

defendant asserted the necessity to appoint a guardian ad litem

for plaintiff. In the companion guardianship matter a different

judge conducted a trial and concluded plaintiff was competent.

 In our view, the trial judge is in the best position to

discern whether plaintiff feigned ignorance. He did not make

such a finding. Rather, his opinion conveys plaintiff was

 14 A-5829-13T1
fixated on a given set of results on somewhat specific issues,

and "she clearly was stressed beyond her limits."

 Importantly, despite his general finding defendant was

credible,2 and although there is no serious challenge to the fact

the parties' living expenses exceeded defendant's earnings

necessitating supplemental funds unquestionably provided by the

family trusts, the judge rejected defendant's position seeking

plaintiff to share in the obligation to repay the loans. This

decision turned on a conclusion defendant did not satisfactorily

meet his obligation to prove he must repay the debts. This

conclusion is supported by the record.

 In finding defendant's proofs deficient, the judge noted:

the notes contained no specific terms for interest or repayment;

the trust did not intervene in the litigation to protect its

interest; documents produced lacked specificity as to the total

amounts distributed, which were asserted only by defendant; and

defendant generally held a beneficial interest in the trusts.

Most significant among the judge's findings was the absence of

disclosure of the debts on the 2002 and 2004 mortgage loan

2
 The judge found defendant to be "cooperative, forthcoming
and credible." He "responded in a candid, straight forward,
direct, non-evasive manner to questions on direct and cross-
examination."

 15 A-5829-13T1
applications and the loan officer's lack of recollection to

corroborate defendant's testimony he orally revealed the debts.

 Even if plaintiff were aware of the borrowings, as

defendant now argues, the judge determined defendant's claim of

required repayment was neither binding nor determinative.

Rather, he scrutinized the evidence and found defendant's

assertions of necessary repayment was "not credible." We defer

to these supported factual findings, including this credibility

assessment. Cesare, supra, 154 N.J. at 412. Accordingly, we

discern no basis to interfere with the conclusion plaintiff was

not obligated to reimburse these monies.

 B.

 Next, in Points II, III, and IV, defendant raises several

arguments attacking the trial judge's valuation and equitable

distribution of his interest in the law firm. Defendant

suggests there are factual flaws in the findings and further

seeks reversal based on a misapplication of the law. For the

reasons discussed below, we conclude the calculation of the

value of defendant's law practice and percentage interest

granted to plaintiff must be reversed.

 We first recite the pertinent facts. Defendant joined his

firm in 1978 when he graduated from Harvard Law School. He

specialized in complex tax matters and billed over 2000 hours

 16 A-5829-13T1
each year. He was named an equity partner on January 1, 1984,

and owned one share of stock. The firm modified its structure

on January 1, 2013, changing from a professional corporation to

a limited liability partnership. Defendant was required to

provide a $300,000 capital contribution, financed through a

four-year note.

 Detailed and lengthy testimony from the firm's chief

administrative officer (CAO) and the parties' respective

forensic accounting experts — Ilan Hirschfeld for plaintiff, and

Thomas J. Hoberman for defendant — described defendant's annual

compensation, and offered opinions on the fair value of his

interest in the law firm as of May 20, 2008, the date plaintiff

filed her complaint for divorce.

 Defendant is a party to a shareholder's agreement with the

firm. The agreement includes the firm's obligation to purchase

a shareholder's stock when he or she ceases to be employed by

the firm, and defines the formula fixing the amount of payment

for the interest.

 The CAO explained the firm's compensation system for equity

partners, including the calculation of each partner's interest

in the firm, known as the termination credit account (TCA).3

3
 The CAO testified as of the date of trial, based on the
firm's status, partners no longer received W-2s, no longer
 (continued)

 17 A-5829-13T1
Throughout the year, partners received a draw and expenses and

benefits, such as pension contributions, professional dues and

associations, medical claims, as well as professional liability

and life insurances. These payments reduced an individual's

TCA. Then, at year-end, the firm's nine-member compensation

committee computed the firm's excess income, which is allocated

among the equity partners, based on a defined formula

replenishing the TCA as of December 31. The allocation

considered billable hours, "evaluated time," that is, collection

of billings, and origination of new business. Seniority does

not affect compensation, and past performance may be

subjectively considered in a specific allocation. In essence,

the TCA represents the equity partner's interest in the firm.

 Much of defendant's workload is originated by fellow

partners. He was not a significant originator of new clients;

rather, he worked many hours in his highly specialized practice

area. Defendant received a gross bi-monthly draw, a quarterly

distribution and a variable amount of excess distributions,

based on his allocation of firm's year-end net income, or

profit. There also was an interest component attached to the

TCA.

(continued)
participate in the employee pension plan, and are not permitted
to participate in flexible spending plans.

 18 A-5829-13T1
 Although the firm no longer imposes a mandatory retirement

age, once an equity partner reached age sixty-five, the board of

directors determines whether the individual could continue to

participate in the allocation system or whether he or she moves

to senior status, which is a salaried position. If a partner

moved to senior status, the TCA account would not increase by

future allocations, and charges against the account would cause

it to decrease. The balance of the TCA would be paid out over

four years, when an equity partner left the firm. Further, upon

defendant's completion of thirty-years of partnership

participation, he became eligible to receive a discretionary

longevity bonus equal to twenty-five percent of the average

salary earned during the five highest of his final ten years of

service. In May 2008, defendant had not accrued the requisite

vesting period; however, he achieved this milestone on December

31, 2013, prior to trial.

 Hirschfeld's report computed "a calculation of value" of

defendant's interest in the firm, comprised of his TCA "as well

as the value of his interest in the enterprise value or

goodwill, of the Firm." The latter intangible "includes, but is

not limited to, it[]s business reputation, national name

recognition, and established relationship with its clients and

 19 A-5829-13T1
employees, all of which provide value to the Firm and its

owners."

 In determining defendant's TCA account, Hirschfeld assumed

defendant would retire at age seventy, used an annual two

percent growth period, and an average of defendant's annual

compensation over five years, adjusted for extraordinary non-

reoccurring distributions. Also, an adjustment was made to

include the projected longevity bonus. Following this

methodology, he calculated the after tax TCA value as $350,830.

Following cross-examination, prior to redirect, Hirschfeld

prepared a revised computation, making several adjustments to

his original calculations. On redirect, he explained the

changes resulted because he agreed some of Hoberman's

challenges. The bottom line was a revised TCA value of

$292,908.

 Goodwill was added as a component of defendant's firm

interest. First, Hirschfeld determined the reasonable

compensation of an attorney with defendant's education and

experience.4 The differential between the reasonable

compensation and the distributions made represented defendant's

4
 Both Hirschfeld and Hoberman relied on data published in
the Survey of Law Firm Economics by Altman Weil Publications,
Inc. as a reference for annual billable hours and reasonable
compensation for those working in defendant's legal specialty;
Hirschfeld used the 2007 issue, while Hoberman used 2008.

 20 A-5829-13T1
share of the firm's profits as an owner. Earnings based on

historic data were projected to defendant's retirement date at

age seventy adjusted for taxes, using a forty percent tax rate,

then reduced to present value. Following these calculations,

Hirschfeld opined the goodwill value of defendant's individual

interest in the firm was $1,198,770. This too was revised on

redirect, after various corrections were made, to $1,185,304.

 Hoberman's methodology to compute the TCA was similar to

Hirschfeld's; however, his overall opinion of value differed, as

he concluded there was no separate goodwill interest in

defendant's firm ownership. In computing the TCA, Hoberman

noted equity partners contracted to subordinate their TCA

accounts to the firm's equity credit line. Defendant asserted

$98,463 of his TCA was subordinated as security to this line of

credit. Hoberman opined the billable hours, hourly rate of

compensation, and average billings as reported for defendant

were consistent with the Altman Weil survey for an attorney

similarly situated. It was Hoberman's opinion defendant's

accrual basis income allocation was similar to the reported

reasonable compensation data. Therefore, the TCA account alone

represented the true value of defendant's interest in the firm,

and there was no additional goodwill component. He computed the

TCA account balance on the date of the complaint as $620,000,

 21 A-5829-13T1
which discounted for present value and adjusted for taxes

determined defendant would realize $285,000.

 Hoberman disagreed with Hirschfeld's calculations, noting

areas where Hirschfeld double counted items; added perquisites,

which defendant did not receive; used a depressed reasonable

compensation amount. Further, Hoberman disagreed the TCA would

steadily increase annually as Hirschfeld assumed and asserted

Hirschfeld wrongly allocated non-reoccurring special allocations

as if they would be regularly received. Finally, Hoberman

explained his rejection of the inclusion of goodwill.

 In his written opinion, the trial judge found it

"incredible" the firm had no goodwill value. Consequently, the

judge rejected Hoberman's opinion. Although the opinion recites

Hoberman's testimony identifying errors and flaws in

Hirschfeld's report, the judge, without clarification, accepted

the original unadjusted valued stated by Hirschfeld: that is,

the TCA as $350,830 plus goodwill for defendant's interest

valued as $1,198,077. The judge reduced the total by the

$300,000 debt defendant incurred to fund his capital account

upon the firm's restructuring. He then awarded plaintiff one-

half of the remainder as her equitable interest.

 On appeal, defendant argues the court's conclusion

demonstrates a "misunderstanding of the facts, [a]

 22 A-5829-13T1
misapplication of the law and . . . [an] abdication of . . .

responsibility to reach a result that was the product of a

careful and reasoned application of the law to the actual

facts." He notes the judge used Hirschfeld's initial

calculations of value even though Hirschfeld had changed his

opinion and reduced the total value on redirect.5

 On the issue of goodwill, defendant asserts the trial judge

erred by assuming because the firm had goodwill, individual

partners must separately have goodwill. Another legal error

defendant raises is the reliance on an unpublished opinion to

justify the trial conclusion. Moreover, defendant maintains

prior New Jersey Supreme Court opinions support his position

that he has no goodwill interest in his firm. Alternatively, he

argues the amount fixed for this intangible asset was neither

explained nor supported.

 Defendant additionally argues the judge abused his

discretion by awarding a fifty-percent distribution to

plaintiff, effectively allocating the same dollars three times.

We consider these issues.

5
 Defendant also notes the judge misunderstood the impact of
defendant's required capital contribution and accompanying debt
incurred during the firm's restructuring. He notes this
benefited him because the judge reduced his interest by the debt
amount even though the debt and the capital account offset each
other. He makes this point to demonstrate the judge's lack of
understanding of the issues.

 23 A-5829-13T1
 Trial courts must always remember,

 "[t]he goal of equitable distribution . . .
 is to effect a fair and just division of
 marital [property]." Steneken v. Steneken,
 183 N.J. 290, 299 (2005) (citation omitted).
 To fashion an equitable distribution award,
 the trial judge must identify the marital
 assets, determine the value of each asset,
 and then decide "how such allocation can
 most equitably be made." Rothman v.
 Rothman, 65 N.J. 219, 232 (1974). In
 addition, the judge must consider, but is
 not limited to, the sixteen statutory
 factors set forth in N.J.S.A. 2A:34-23.1.
 Fashioning an equitable distribution of
 marital assets and debts requires more than
 simply "mechanical division"; it requires a
 "weighing of the many considerations and
 circumstances . . . presented in each case."
 Stout v. Stout, 155 N.J. Super. 196, 205
 (App. Div. 1977).

 [Elrom v. Elrom, 439 N.J. Super. 444 (App.
 Div. 2015).]

 "A Family Part judge has broad discretion . . . in

allocating assets subject to equitable distribution." Clark v.

Clark, 429 N.J. Super. 61, 71-72 (App. Div. 2012). However,

"discretion is not unbounded and is not the personal

predilection of the particular judge." Catholic Family & Cmty.

Serv. v. State-Operated Sch. Dist. of Paterson, 412 N.J. Super.

426, 442 (App. Div. 2010) (quoting State v. Madan, 366 N.J.

Super. 98, 109 (App. Div. 2004)). "[T]he authority to exercise

. . . discretion is not an arbitrary power of the individual

judge, to be exercised when, and as, his caprice, or passion, or

 24 A-5829-13T1
partiality may dictate . . . ." Ibid. (quoting Madan, supra,

366 N.J. Super. at 109). Rather, the nature of judicial

discretion requires a trial judge to determine whether to act,

and if so, to render a decision "guided by the spirit,

principles and analogies of the law, and founded upon the reason

and conscience of the judge, to a just result in the light of

the particular circumstances of the case." Smith v. Smith, 17

N.J. Super. 128, 132 (App. Div. 1951), certif. denied, 9 N.J.

178 (1952). "Moreover, the court must provide factual

underpinnings and legal bases supporting the exercise of

judicial discretion." Clark, supra, 429 N.J. Super. at 72.

 We must reverse if we find the trial judge clearly abused

his or her discretion, such as when the stated "findings were

mistaken[,] or that the determination could not reasonably have

been reached on sufficient credible evidence present in the

record[,]" or where the judge "failed to consider all of the

controlling legal principles." Gonzalez-Posse v. Ricciardulli,

410 N.J. Super. 340, 354 (App. Div. 2009); see also Wadlow v.

Wadlow, 200 N.J. Super. 372, 382 (App. Div. 1985) (reversal is

required when the results could not "reasonably have been

reached by the trial judge on the evidence, or whether it is

clearly unfair or unjustly distorted by a misconception of the

law or findings of fact that are contrary to the evidence."

 25 A-5829-13T1
(quoting Perkins v. Perkins, 159 N.J. Super. 243, 247 (App. Div.

1978))).

 It is a settled legal question that intangible goodwill may

attach to an attorney's interest in a professional practice.

Dugan v. Dugan, 92 N.J. 423, 433 (1983). If found, the value of

goodwill is subject to the equitable distribution claims of the

non-titled spouse. Ibid. However, the determination of the

amount ascribed to goodwill is a complex question of fact.

 In this case, the ultimate question that must be resolved

is the value of goodwill defendant had as an equity partner in

the firm. In concluding goodwill existed as a component of

value of this marital asset, the trial judge failed to make

specific factual findings to support the value of attendant

goodwill. Consequently, we are constrained to reverse the

resultant unsupported conclusions.

 The most straightforward basis for our conclusion is the

value of defendant's interest in his law firm, as stated in the

final judgment, was taken from Hirschfeld's original opinion

without consideration of Hirschfeld's revised testimony. After

initially testifying, Hirschfeld distinctly reduced his initial

calculations of the TCA and the goodwill components, admitting

they were flawed. Inexplicably, the trial judge overlooked this

evidence and incorporated the original calculations.

 26 A-5829-13T1
 Next, the judge's stated factual findings are predominately

conclusory. The judge recited the experts' testimony and

acknowledged Hoberman's criticisms of Hirschfeld's calculations.

Thereafter, the judge rejected Hoberman's opinion the value of

goodwill was zero, and ordered the value originally opined by

Hirschfeld. However, no reasons were offered for why Hoberman's

challenges to Hirschfeld's value apparently was found

unpersuasive, and no analysis or evidence supports the ultimate

conclusion.

 Certainly, a factfinder may accept or reject expert

testimony in whole or in part, Brown v. Brown, 348 N.J. Super.

466, 478 (App. Div.), certif. denied, 174 N.J. 193 (2002), but

there must be a weighing and evaluation of the evidence to reach

whatever conclusion may logically flow from the aspects of

testimony the court accepts. All conclusions must be supported.

 As Dugan instructs, the start of the examination of

goodwill considers whether excess earnings exist. Dugan, supra,

92 N.J. at 439-40. This was a highly contested issue on which

the experts used slightly different resources and offered

greatly disparate opinions. Factual findings regarding this

pivotal question were not provided.

 A judge's failure to perform factfinding "constitutes a

disservice to the litigants, the attorneys and the appellate

 27 A-5829-13T1
court." Curtis v. Finneran, 83 N.J. 563, 569-70 (1980) (quoting

Kenwood Assocs. v. Bd. of Adjustment Englewood, 141 N.J. Super.

1, 4 (App. Div. 1976)); R. 1:7-4(a); see also Kas Oriental Rugs,

Inc. v. Ellman, 407 N.J. Super. 538, 562-63 (App. Div.), certif.

denied, 200 N.J. 476 (2009) (requiring a judge, to "find the

facts and state [all] conclusions of law . . . on every motion

decided by a written order that is appealable as of right").

 The judge also made no findings when fixing plaintiff's

entitlement to defendant's interest in his law firm at fifty-

percent. The equitable distribution statute "reflects a public

policy that is 'at least in part an acknowledgment that marriage

is a shared enterprise, a joint undertaking, that in many ways

[] is akin to a partnership.'" Thieme v. Aucoin-Thieme, 227

N.J. 269, 284 (2016) (quoting Smith v. Smith, 72 N.J. 350, 361

(1977)). But, equitable is not synonymous with equal. See

Rothman, supra, 65 N.J. at 232 n.6. Our courts must remain true

to the legislative mandate expressed in N.J.S.A. 2A:34-23.1,

which assures an ordered equitable distribution be "designed to

advance the policy of promoting equity and fair dealing between

divorcing spouses." Barr v. Barr, 418 N.J. Super. 18, 45 (App.

Div. 2011). This requires evaluation of unique facts attributed

to each asset.

 28 A-5829-13T1
 The omission of necessary findings requires we vacate

provisions in the final judgment fixing the value and

distribution of defendant's interest in the firm. To aid the

remand proceeding, the outcome of which will require analysis

and establishment of supporting factual findings necessary to

resolve the complex question of value surrounding a goodwill

component attached to an interest in a law firm, we recite the

authority establishing goodwill as an intangible asset subject

to equitable distribution, as well as the required analysis to

be undertaken by a trial court when fixing goodwill value.

 In Stern v. Stern, 66 N.J. 340 (1975), the Court examined

the defendant's challenges to ordered equitable distribution of

his partnership interest in a "very successful, well-known and

highly respected law firm." Id. at 344. In part, the defendant

contested "the propriety of considering his earning capacity as

being a separately identified and distinct item of property."

Ibid. The Court agreed, stating:

 [A] person's earning capacity, even where
 its development has been aided and enhanced
 by the other spouse, as is here the case,
 should not be recognized as a separate,
 particular item of property within the
 meaning of N.J.S.A. 2A:34-23. Potential
 earning capacity is doubtless a factor to be
 considered by a trial judge in determining
 what distribution will be "equitable" and it
 is even more obviously relevant upon the
 issue of alimony. But it should not be

 29 A-5829-13T1
 deemed property as such within the meaning
 of the statute.

 [Id. at 345 (footnote omitted).]

 The Court also discussed the methodology for making this

difficult assessment of value. Id. at 346. In this regard, the

partnership agreement was the starting point.

 Generally speaking, the monetary worth of
 this type of professional partnership will
 consist of the total value of the partners'
 capital accounts, accounts receivable, the
 value of work in progress, any appreciation
 in the true worth of tangible personalty
 over and above book value, together with
 good will, should there in fact be any; the
 total so arrived at to be diminished by the
 amount of accounts payable as well as any
 other liabilities not reflected on the
 partnership books. Once it is established
 that the books of the firm are well kept and
 that the value of partners' interests are in
 fact periodically and carefully reviewed,
 then the presumption to which we have
 referred should be subject to effective
 attack only upon the submission of clear and
 convincing proofs.

 [Id. at 346-47 (footnotes omitted).]

 Although not reviewing the valuation of the intangible

goodwill of the defendant's partnership interest, the Court

explained:

 The good[]will of a law firm, for ethical
 reasons, may not be sold or transferred for
 a valuable consideration. N.J. Advisory
 Committee on Professional Ethics, Op. 48, 87
 N.J.L.J. 459 (1964); Opinion 80, 88 N.J.L.J.
 460 (1965). It may, however, in a given
 case, be possible to prove that it does

 30 A-5829-13T1
 exist and is a real element of economic
 worth. Concededly, determining its value
 presents difficulties. Rev. Rul. 609, 1968-
 2 Cum. Bull. 327.

 [Id. at 347 n.5.]

 Years later, in Dugan, the Court undertook review of

whether goodwill was part of the value of the plaintiff's, a

solo practitioner, law practice, "if so, whether it constitutes

property subject to equitable distribution; and, if so, how it

is to be evaluated." Dugan, supra, 92 N.J. at 428. Noting

intangible goodwill is "essentially reputation that will

probably generate future business," the Court suggested goodwill

encompasses the "advantages of an established business that

contribute to its profitability," such as a good name, capable

staff, and a reputation for superior services. Id. at 429-30.

Further, "[g]oodwill can be translated into prospective

earnings." Id. at 431. Emphasizing "future earning capacity,

per se, is not goodwill," the Court held, "[W]hen that future

earning capacity has been enhanced because reputation leads to

probable future patronage from existing and potential clients,

goodwill may exist and have value. When that occurs the

resulting goodwill is property subject to equitable

distribution." Id. at 433; see also Levy v. Levy, 164 N.J.

Super. 542, 554 (Ch. Div. 1978) ("What is being measured is in

reality the capacity of repeat patronage and of a certain

 31 A-5829-13T1
immunity to competition to produce earnings beyond the average

for that kind of business."). The Court explained:

 After divorce, the law practice will
 continue to benefit from that goodwill as it
 had during the marriage. Much of the
 economic value produced during an attorney's
 marriage will inhere in the goodwill of the
 law practice. It would be inequitable to
 ignore the contribution of the non-attorney
 spouse to the development of that economic
 resource. An individual practitioner's
 inability to sell a law practice does not
 eliminate existence of goodwill and its
 value as an asset to be considered in
 equitable distribution. Obviously, equitable
 distribution does not require conveyance or
 transfer of any particular asset. The other
 spouse, in this case the wife, is entitled
 to have that asset considered as any other
 property acquired during the marriage
 partnership.

 [Dugan, supra, 92 N.J. at 434.]

 "For purposes of valuing the goodwill of a law practice,

the true enhancement to be evaluated is the likelihood of repeat

patronage and a certain degree of immunity from competition."

Ibid. Careful consideration in assigning value to goodwill in a

divorce action is required because the attorney-spouse is

essentially "forced to pay the ex-spouse 'tangible' dollars for

an intangible asset." Id. at 435.

 Dugan articulated "one appropriate method to determine the

value of goodwill of a law practice." Id. at 139. This

computation is "accomplished by fixing the amount by which the

 32 A-5829-13T1
attorney's earnings exceed that which would have been earned as

an employee by a person with similar qualifications of

education, experience and capability." Ibid.; see also Levy,

supra, 164 N.J. Super. at 547 ("Where the business is a service

organization then the question of excess [net earnings] requires

comparison of the net earnings with the reasonable value of the

personal services which produced them."). The methodology

followed requires a trial court to

 first, ascertain what an attorney of
 comparable experience, expertise, education
 and age would be earning as an employee in
 the same general locale. The effort that
 the practitioner expends on his law practice
 should not be overlooked when comparing his
 income to that of the hypothetical employee.
 A sole practitioner who, for example, works
 a regular sixty-hour week may have a
 significantly greater income than an
 employee who regularly works a forty-hour
 week, and the income may be due to greater
 productivity rather than the realization of
 income on the sole practitioner's goodwill.
 Next, the attorney's net income before
 federal and state income taxes for a period
 of years, preferably five, should be
 determined and averaged. The actual average
 should then be compared with the employee
 norm. If the attorney's actual average
 realistically exceeds the total of (1) the
 employee norm and (2) a return on the
 investment in the physical assets, the
 excess would be the basis for evaluating
 goodwill.

 The excess is subject to a
 capitalization factor [which is] the number
 of years of excess earnings a purchaser
 would be willing to pay for in advance in

 33 A-5829-13T1
 order to acquire the goodwill. The precise
 capitalization factor would depend on [a
 variety of factors including] [t]he age of a
 lawyer . . . because . . . goodwill would
 probably terminate upon death. . . .
 Subject to such adjustments, . . . a figure
 close to the true worth of the law
 practice's goodwill may be obtained.

 [Dugan, supra, 92 N.J. at 439-400 (citations
 omitted).]

 The Court's discussion also makes it clear this stated

methodology was not dispositive. Understanding Dugan involved a

solo practitioner, the Court acknowledged other means of

reaching the required determination may be appropriate,

including reference to partnership or shareholder agreements,

and consideration of

 the limitations to which we have previously
 alluded, as well as the expertise and age of
 the individual should be factored into any
 evaluation. Moreover, potential federal tax
 consequences should be considered in
 determining equitable distribution.

 [Id. at 441.]

Here, a nuanced valuation methodology is required because

defendant is an equity partner in a large firm, who generally is

not responsible for originations, and who is bound by the firm

policies and a shareholder agreement.

 Each expert offered an opinion of the reasonable

compensation for an attorney similarly situated, having

comparable experience and expertise, to discern the reasonable

 34 A-5829-13T1
compensation for defendant's services and whether he received

excess earnings. Yet, the judge failed to analyze the

differences in these opinions, which essentially drove the

conclusion reached by each expert. Further, Hoberman's

identification of flaws in Hirschfeld's analysis, some of which

were conceded by Hirschfeld, were completely overlooked.

 We believe the trial judge misunderstood Hoberman's

conclusion, as suggesting goodwill did not exist for the firm.

Actually, Hoberman's opinion asserted the TCA of each equity

partner accounted for any goodwill. Further, plaintiff, who was

not an originator but a worker in a highly specialized legal

area, was actually paid what a similarly skilled lawyer would be

paid. Thus, defendant's compensation matched his earning

capacity, nothing more. This view considered whether

defendant's "future earning capacity has been enhanced because

reputation leads to probable future patronage from existing and

potential clients" and concluded it did not. Accordingly, there

was no additional component of goodwill. Id. at 433.

 In this matter, any analysis of goodwill must evaluate the

firm's shareholder's agreement to determine whether it is an

appropriate measure of the total firm value, including goodwill.

That formula computes an exiting partner's interest, calculated

as a portion of the firm's excess earnings. See Levy, supra,

 35 A-5829-13T1
164 N.J. Super. at 534. The Court must discern the

objectiveness and accuracy of the formula and calculations.

When "it is established that the books of the firm are well kept

and that the value of partners' interests are in fact

periodically and carefully reviewed, then the presumption to

which we have referred should be subject to effective attack

only upon the submission of clear and convincing proofs."

Stern, supra, 66 N.J. at 347.

 Further, when calculating the value of his firm asset, the

analysis must consider defendant's projected term of future

employment. As noted, Hirschfeld assumed defendant would

continue as an equity partner until age seventy. However,

evidence was presented showing defendant's working status may

change once he reaches age sixty-five. At that point, the firm

could require defendant to become a salaried employee. The

firm's established policies may make the use of earnings over an

additional five-year period as an equity partner, rather than

senior status inappropriate. If so, the calculation used by

Hirschfeld must be considered to discern if they artificially

inflated goodwill. This area of analysis was not undertaken.

See R. 1:7-4.

 The value attributed by the judge to defendant's TCA

interest suffers similar faults. First, Hirschfeld modified his

 36 A-5829-13T1
initial value, reducing it from $350,830 to $292,908. Second,

the modified value assumed defendant would remain an equity

partner until age seventy, continuing to work at the same pace

regardless of his advanced age. As noted, the facts in evidence

tear at the accuracy of this assumption. Finally, no findings

were made to support why Hoberman's computation was rejected in

favor of Hirschfeld's. The conclusory determination by the

judge is unfounded.

 Once the value of defendant's interest in his firm is

determined, an analysis must be made to discern plaintiff's

interest in the asset. This demands an examination of equitable

factors set forth in N.J.S.A. 2A:34-23.1. The Legislature has

mandated: "In every case . . . the court shall make specific

findings of fact on the evidence relevant to all issues

pertaining to asset eligibility or ineligibility, asset

valuation, and equitable distribution, including specifically,

but not limited to, the factors set forth in this section."

Ibid. Specific to this asset, a measure of consideration must

be given to the lack of intrinsic value associated with any

amount determined as individual goodwill. N.J.S.A. 2A:34-

23.1(p); see also Dugan, supra, 92 N.J. at 435.

 For these reasons, the provisions of the final judgment

fixing the value of defendant's interest in his law firm, as

 37 A-5829-13T1
well as setting plaintiff's equitable interest in this marital

asset, must be vacated and the matter remanded for further

consideration consistent with this opinion. We understand the

trial judge has been assigned to a different trial division, and

because certain credibility determinations were made, which are

now set aside as unsupported, we order the matter reassigned by

the Presiding Judge of the Family Part to a new trial judge. We

need not further analyze the argument offered by defendant in

Point IX.

 We reject as unavailing defendant's argument that the

inclusion of properly computed goodwill double counts the same

dollars. See Steneken, supra, 183 N.J. at 298 (emphasizing

because alimony and equitable distribution serve two separate

purposes, it is not required that "a credit on one side of the

ledger must perforce require a debit on the other side").

 Another issue related to this obligation, set forth in

Point VII, challenges the payment schedule to satisfy

plaintiff's equitable distribution interest, provided in the

July 18, 2014 post-judgment order. Although a payment schedule

for satisfaction of equitable distribution may be equitable

here, the payment provisions must be vacated because the amount

of the assets and plaintiff's interest remains subject to

further review.

 38 A-5829-13T1
 C.

 In Point VIII, defendant argues the trial court erred in

distributing his Union Central and Wells Fargo IRAs urging they

were funded with monies from a premarital bank account.

Following trial, the judge accepted defendant's proofs and

concluded the assets were exempt from equitable distribution.

See Valentino v. Valentino, 309 N.J. Super. 334, 338 (App. Div.

1998) ("Any property owned by a husband or wife at the time of

marriage will remain the separate property of such spouse and in

the event of divorce will be considered an immune asset and not

eligible for distribution."). Upon plaintiff's motion for

reconsideration, the judge changed his mind, stating "there was

no believable evidence produced by [d]efendant to establish that

these funds were premarital and the so-called proofs postdated

the marriage by eight years. Obviously the court was mistaken

in its decision." This explanation is lacking, and conflicts

with the very detailed credibility findings made by the court,

accepting defendant's trial testimony, as stated in the final

judgment.

 Although no documents verifying the establishment of the

premarital bank account were presented, evidence in the form of

defendant's testimony was presented on this issue. Also,

defendant admitted two checks from the account and explained

 39 A-5829-13T1
other records were destroyed when the parties' home was flooded.

The checks reflect the asset was titled solely to defendant and

note payments were transferred to the subject IRA accounts.

Plaintiff cross-examined defendant in an effort to challenge his

credibility, but provided no testimony of evidence refuting his

claims.

 We are unable to reconcile the statements in the post-

judgment order referencing "so-called proofs" or why defendant's

testimony first found "forthcoming," "candid, straight-forward,

direct," and "non-evasive," was thereafter characterized as "no

believable evidence." Testimony is evidence, and the

contradictory conclusions without more require the provision in

the July 28, 2014 order be vacated and the issues reviewed anew

on remand.

 D.

 Lastly, defendant argues the court abused its discretion in

awarding plaintiff counsel fees and expert costs in connection

with litigation. The assessment of counsel fees is

discretionary. Packard-Bamberger & Co. v. Collier, 167 N.J. 427,

444 (2001); Eaton v. Grau, 368 N.J. Super. 215, 225 (App. Div.

2004). In our review, "[w]e will disturb a trial court's

determination on counsel fees only on the 'rarest occasion,' and

then only because of clear abuse of discretion." Strahan v.

 40 A-5829-13T1
Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008) (citing

Rendine v. Pantzer, 141 N.J. 292, 317 (1995)).

 An allowance for counsel fees is permitted to any party in

a divorce action, R. 5:3-5(c), subject to the provisions of Rule

4:42-9. The rule provides that "all applications for the

allowance of fees shall be supported by an affidavit of services

addressing the factors enumerated by RPC 1.5(a)." R. 4:42-9(b).

To determine whether and to what extent such an award is

appropriate, the court must consider:

 (1) the financial circumstances of the
 parties; (2) the ability of the parties to
 pay their own fees or to contribute to the
 fees of the other party; (3) the
 reasonableness and good faith of the
 positions advanced by the parties both
 during and prior to trial; (4) the extent of
 the fees incurred by both parties; (5) any
 fees previously awarded; (6) the amount of
 fees previously paid to counsel by each
 party; (7) the results obtained; (8) the
 degree to which fees were incurred to
 enforce existing orders or to compel
 discovery; and (9) any other factor bearing
 on the fairness of an award.

 [R. 5:3-5(c).]

 Here, the judge evaluated the statutory factors in

rendering his award to plaintiff. He ordered defendant pay

$467,793.38 in fees and $23,804.24 in expert costs. However, we

determine certain findings were mistaken, and the need for

 41 A-5829-13T1
additional review requires reversal. Rova Farms, supra, 65 N.J.

at 484.

 First, we comment on certain findings made on this issue,

which must be set aside. The judge stated defendant was

"extremely well-off . . . earning in excess of $1,000,000 per

year." This finding failed to account for ordered obligations,

which significantly impact defendant's available income,

including alimony and equitable distribution payments along with

debts for which defendant was solely responsible.

 Next, the judge found defendant's positions regarding the

loans and the zero goodwill value in his firm evinced badges of

bad faith. This finding is unsupported. The existence of the

borrowings was not disputed. At issue was repayment. The

position was not fallacious; rather, the proofs were found

insufficient. Further, we reversed the findings regarding value

of defendant's interest in his firm.

 That a party advances a legal position reasonably supported

which the court rejects, is not the equivalent of "bad faith."

Tagayun v. AmeriChoice of N.J., Inc., 446 N.J. Super. 570, 580

(App. Div. 2016) ("When [a party]'s conduct bespeaks an honest

attempt to press a perceived, though ill-founded and perhaps

misguided, claim, he or she should not be found to have acted in

bad faith." (quoting Belfer v. Merling, 322 N.J. Super. 124,

 42 A-5829-13T1
144-45 (App. Div.), certif. denied, 162 N.J. 196 (1999)).

Examples of bad faith include misusing or abusing process,

seeking relief not supported by fact or law, intentionally

misrepresenting facts or law, or otherwise engaging in vexatious

acts for oppressive reasons. Borzillo v. Borzillo, 259 N.J.

Super. 286, 293-94 (Ch. Div. 1992). None of these events

occurred.

 Second, certain findings are no longer accurate. The judge

considered the amount of fees plaintiff incurred, stated as more

than "$1.7 million," finding plaintiff would be forced to expend

a portion of her equitable distribution to pay her remaining

counsel fees. However, the supplemental orders entered on June

7, 2016, stipulated plaintiff's indebtedness to her attorneys

stood at $450,000, plus interest. This sum is less than the

amount defendant was ordered to contribute.

 Although we reject defendant's suggestion of collusion, the

debt owed by plaintiff is unquestionably relevant to any award

imposed on the adverse party. Argila v. Argila, 256 N.J. Super.

484, 490 (App. Div. 1992). Whatever the reason plaintiff's

counsel consented to compromise the sums claimed due, a burden

placed on defendant for payment must fairly account for the

obligation plaintiff owes.

 43 A-5829-13T1
 The judge's reliance on the results obtained by plaintiff

has now been altered on appeal as we have vacated the provisions

fixing the value of defendant's interest in his law firm.

Finally, no assessment was made regarding plaintiff's actions,

her refusal to answer, being disruptive and otherwise

uncooperative, and causing the trial to extend over nineteen

days.

 The order cannot stand because it was based on

insufficient, and now, vacated findings. The provision ordering

defendant to pay plaintiff's fees is vacated. We direct the

issue reviewed on remand.

 We do not disturb the ordered expert fees. The sums

ordered represent a reasonable allocation to assure a level

playing field between the parties. Kelly v. Kelly, 262 N.J.

Super. 303, 307 (Ch. Div. 1992).

 III.

 Plaintiff's cross-appeal argues the trial judge abused his

discretion by refusing to retroactively award her an additional

$300,000 in pendente lite support for the period June 2009

through June 2014, plus $53,000 to repay a loan she incurred.

We disagree.

 The September 19, 2008 pendente lite support order directed

defendant to pay all plaintiff's monthly shelter and

 44 A-5829-13T1
transportation expenses as listed in her Case Information

Statement (CIS); an additional $10,000 for monthly personal

expenses. Further, defendant remained obligated to maintain

medical insurance, pay plaintiff's medical expenses, and

continue all life and car insurance. On May 21, 2009, the judge

granted defendant's motion to halve his monthly contribution to

plaintiff's personal expenses, effective June 15, 2009, based on

proof of a decrease in his income. Plaintiff did not seek

further review or adjustment of support and evidence shows

plaintiff's income increased from the 2009 levels.

 Pendente lite support orders are subject to modification at

the time final judgment is entered. Mallamo v. Mallamo, 280

N.J. Super. 8, 12 (App. Div. 1995). Any changes in the initial

orders rest with the trial judge's discretion. Jacobitti v.

Jacobitti, 263 N.J. Super. 608, 617 (App. Div. 1993), aff'd, 135

N.J. 571 (1994). A retroactive increase in the ordered pendente

lite support should be considered when the amount initially

awarded based on limited information at the inception of a

matrimonial matter is later determined "woefully inadequate" or

"obviously unjust" once all facts and circumstances are fleshed

out at trial. Id. at 617-18.

 45 A-5829-13T1
 In denying plaintiff's request for an award amounting to an

additional $5000 per month for the period June 2009 through June

2014, the trial judge found:

 Plaintiff has failed to set forth any
 justifiable reason to give her a windfall of
 this nature. She has not demonstrated any
 additional need. She did not prove that she
 needed a $53,000.00 insurance loan. The
 $5,000 [pendente lite] order for
 [p]laintiff's [personal] expenses entered in
 May of 2009 was consistent with the marital
 lifestyle. The evidence established that
 during the [pendente lite] timeframe,
 [p]laintiff received a far larger share of
 [d]efendant's net income than he did . . . .
 Plaintiff likewise failed to account for the
 income she received during that period.

 Plaintiff's motion for reconsideration of this order was

denied, as plaintiff had not "convinced the court of the

efficacy of her argument." The judge stated:

 The alimony awarded to her of
 $260,000.00 per year is before taxes. After
 taxes are deducted she nets only about
 $175,000.00. Therefore[,] using her own
 logic, she has received in excess of the
 $144,000.00 lifestyle. The net result is
 substantially the same considering the
 passage of 6 years since the original Case
 Information Statement . . . was filed.
 Furthermore, most of the plaintiff's so-
 called financial woes were caused by her.
 She put HIPPA blocks on her medicals
 creating havoc and resulting in unpaid
 bills/judgments against her. She switched
 the cell phone billing. She switched the EZ
 Pass. None of these actions were necessary.
 Plaintiff failed and refused to confer with
 [d]efendant who was paying those bills.
 Plaintiff also raises tuition issues which

 46 A-5829-13T1
 are self-imposed. While the pursuit of
 higher education is certainly a noble
 endeavor, at some point in your life you
 must pursue your career. Plaintiff was 58
 at the time of the trial with an advanced
 education and a professional degree and
 license. There is no evidence that her
 income will be greatly improved by her
 securing an additional advanced degree.

 These findings are supported by the substantial, credible

evidence of record. We will not intervene. Beck, supra, 86

N.J. at 496.

 IV.

 The consolidated appeal regards a challenge to the denial

of defendant's motion to dismiss a petition, initiated by

plaintiff's trial attorneys, to enforce defendant's payment of

the counsel fee award.6 Defendant posited counsel lacked

standing to seek enforcement of the matrimonial order. Notably,

plaintiff's counsel subsequently informed the judge plaintiff

was disputing the invoice, and a motion for a charging lien was

filed. The judge denied defendant's motion, and directed him to

pay the ordered $254,950.03 to plaintiff's counsel's trust

account within thirty days and to comply with the payment

schedule established in the July 28, 2014 order. On appeal,

defendant renews his argument.

6
 Also, defendant sought the judge's recusal, an issue we
need not reach.

 47 A-5829-13T1
 Traditionally, courts in New Jersey have taken a "generous

view of standing." In re N.J. State Contract, 422 N.J. Super.

275, 289 (App. Div. 2011). A litigant has standing to prosecute

an action when that litigant has a "sufficient stake and real

adverseness with respect to the subject matter of the

litigation, and a substantial likelihood that some harm will

fall upon it in the event of an unfavorable decision." In re

N.J. Bd. Of Pub. Utils., 200 N.J. Super. 544, 556 (App. Div.

1985) (citing N.J. State Chamber of Commerce v. N.J. Election

Law Enf't Comm'n, 82 N.J. 57, 67 (1980)). Courts will not

entertain proceedings brought by parties who are merely

interlopers or strangers to a dispute. Ridgewood Educ. Ass'n v.

Ridgewood Bd. of Educ., 284 N.J. Super. 427, 432 (App. Div.

1995). A financial interest in the outcome of the litigation

may confer standing. See Jen Elec., Inc. v. Cty. of Essex, 197

N.J. 627, 644 (2009)

 Defendant challenges plaintiff's counsel's right to move

for enforcement when he was contemporaneously seeking relief

adverse to his former client. Further, he argues to allow

plaintiff's attorney to petition for enforcement permits

preferential treatment of counsel, who is merely one of many of

plaintiff's creditors.

 48 A-5829-13T1
 In Williams v. Williams, 59 N.J. 229 (1971), counsel

petitioned for an award of counsel fees for legal services

rendered to the plaintiff in the matrimonial action, who had

passed away. Id. at 231. Noting there was "no dispute that had

the litigation proceeded to final judgment, [the] plaintiff-wife

would have been entitled to an award of counsel fees and

costs[,]" the Court found "no logical reason why the wife's

untimely demise should relieve the husband of an obligation

which as a matter of policy and justice he ought to bear." Id.

at 233-34. The Court also rejected the defendant-husband's

argument to deny counsel's application because the award was

sought directly and counsel lacked standing, stating:

 In our view, petitioners have standing as
 unpaid solicitors. Our cases recognize that
 while counsel fees and costs are awarded to
 the litigant, they properly "belong" to
 counsel and the allowances are to be held in
 trust for the attorneys who furnished the
 services. Thus, the attorney is a party in
 interest to that extent. Here, there is no
 possibility of recovery from the decedent's
 estate; and, unless petitioners are allowed
 to press their application, they will go
 uncompensated and defendant will be unjustly
 enriched to that extent. In such
 circumstances, we think it clear that
 petitioners should be allowed to proceed in
 their own right.

 [Id. at 234-35 (citations omitted).]

 In Tagliabue v. Tagliabue, 183 N.J. Super. 547 (Ch. Div.

1982), Judge Conrad W. Krafte considered a similar question.

 49 A-5829-13T1
The defendant objected to the petition by plaintiff's former

attorney for fees, maintaining the attorney "[d]oes not have the

right to apply for counsel fees" and counsel "no longer

represents" the plaintiff because "he voluntarily withdrew from

this case." Id. at 548. The defendant's argument was rejected

because: "Equity, which will not permit a wrong to occur without

providing a remedy which is lacking at law, will not be bound by

tight constraints imposed by the law courts in establishing

third-party beneficial status." Id. at 550. The judge

concluded: "This court interprets [Rule] 4:42-9(a)(1) . . . to

create an equitable third-party beneficiary status in favor of

the attorney. Given such status, he may, independently, pursue

his remedy . . . ." Ibid.

 The reasoning expressed in these holdings establishes the

interest counsel has in fee awards, based upon proof of the

reasonable value of work performed in the litigation.

Defendant's recitation of excerpts from Rosenberg v. Rosenberg,

286 N.J. Super. 58, 63-64 (App. Div. 1995) and Poch v. Haag, 105

N.J. Super. 44, 46 (App. Div. 1969), to suggest a counsel fee

award belongs to the client, ignores the context of the cited

passages. Rosenberg involved a client's attempt to limit the

obligation due by her to the sum fixed in the matrimonial

litigation when assessing fees due from the adversary.

 50 A-5829-13T1
Rosenberg, supra, 286 N.J. Super. at 61-69. In dicta, this

court in Poch noted it was "doubtful" the law firm could appeal

pro se, to challenge the amount of a fee award rendered to its

client. Poch, supra, 105 N.J. Super. at 46. These factual

differences provide the context for excerpts, which distinguish

these holdings.

 The right to seek establishment of a counsel fees award

paid by an adversary belongs to the client. The client must

present supporting proofs justifying the award. The amount of

any award is based on the reasonable value of work performed by

counsel, after a factual analysis guided by Rule 5:3-5(c) and

Rule 4:42-9. Similarly, a challenge to the amount of fees

awarded is a claim held by the client. Rosenberg, supra, 286

N.J. Super. at 61-69. However, once a fee award is granted,

Williams identifies the interest of counsel holds in enforcing

payment. Williams, supra, 59 N.J. at 232.

 Two aspects of this order are troublesome. First,

counsel's petition sought to receive all sums due to plaintiff

under the final judgment, not simply attorney fees awarded.

Absent imposition of a constructive trust or establishment of an

attorney's lien, the awards of all sums due plaintiff as a means

to satisfy counsel fees was too broad a remedy. The order in

this regard is error and vacated.

 51 A-5829-13T1
 Second, the petition discloses plaintiff disputed the

reasonableness of fees billed and elected fee arbitration. See

R. 1:20A-3. Under these circumstances, no action to enforce

payment of the fees can be made pending arbitration. R. 1:20A-

6; see Rosenfield v. Rosenfield, 239 N.J. Super. 77, 78 (Ch.

Div. 1989). If the amount of fees is fixed in arbitration, the

attorney may not seek a statutory lien for a greater sum, R.

1:20A-3(e), with the caveat proceedings to preserve the lien and

restrain disposition of lawsuit proceeds pending arbitration are

permitted. Thus, no fees should be remitted to counsel from

defendant or plaintiff until the arbitration proceeding is

competed.

 Here, plaintiff and her former attorneys, after fee

arbitration was initiated, agreed to a stipulated fee amount;

that sum is less than the amount defendant was ordered to

contribute. As stated above, the reduction in the fee

obligation of plaintiff bears directly on any fee awarded she

receives. Leavengood v. Leavengood, 339 N.J. Super. 87, 96

(App. Div. 2001). For all of these reasons the January 9, 2015

determination must be reversed and the matter remanded for

additional review in light of our opinion.

 52 A-5829-13T1
 V.

 In summary, regarding Docket No. A-5829-13, we affirm the

provisions of the final judgment of divorce and the post-

judgment orders denying reconsideration of the treatment of the

family loans and adjustments based upon the pendent lite support

order. We reverse the provision of the final judgment and

orders regarding the valuation of defendant's interest in his

law practice as well as the percentage interest accorded to

plaintiff of this asset. We also reverse the July 28, 2014

order reversing the final judgment's provision concluding the

IRA's were not exempt and the award of counsel fees and costs to

plaintiff. Each of these issues must be reviewed on remand by a

newly assigned Family Part judge. The orders challenged in

Docket No. A-2813-14 are reversed, as the amount of attorney's

fees, if any, must be addressed on remand.

 Any issues raised but not otherwise addressed were found to

lack sufficient merit to warrant discussion in our opinion. R.

2:11-3(e)(1)(E).

 Affirmed in part, reversed in part, and remanded.

 53 A-5829-13T1