**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3259-17T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

RAHEEM CLEVELAND, a/k/a
FUQUAN PAIGE, and NAIM
PAIGE,

     Defendant-Appellant.

_____

Submitted January 23, 2019 – Decided May 21, 2019

Before Judges Fisher and Hoffman.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Indictment No. 12-03-0875.

Joseph E. Krakora, Public Defender, attorney for appellant (Frank M. Gennaro, Designated Counsel, on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Lucille M. Rosano, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant appeals from the Law Division order denying his petition for post-conviction relief (PCR). Defendant sought a new trial, asserting ineffective assistance of counsel. We vacate and remand because the PCR judge failed to make adequate findings of fact and conclusions of law and also mistakenly exercised his discretion by granting only a limited evidentiary hearing.

I.

This case concerned the July 2011 murder of Marquis Robinson in Newark. In 2013, a jury found defendant guilty of first-degree purposeful or knowing murder, first-degree attempted murder, second-degree unlawful possession of a handgun without a permit, and second-degree possession of a handgun for an unlawful purpose. Defendant received an aggregate prison sentence of fifty-five years, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. We affirmed his judgment of conviction on direct appeal, State v. Cleveland, No. A-2422-13 (App. Div. Mar. 23, 2016) (slip op.), and the Supreme Court denied certification. State v. Cleveland, 226 N.J. 212 (2016).

In July 2016, defendant filed the subject PCR petition, asserting he received ineffective assistance of counsel based on his trial counsel's failure to request a mistrial or curative instruction, failure to speak with an alibi witness,

2

and failure to object at several points during the trial. Defendant also alleged a claim of ineffective assistance of appellate counsel. In May 2017, assigned counsel filed an amended PCR petition, asserting trial counsel also failed to raise discovery issues, failed to read or review an August 14, 2011 newspaper article regarding the police investigation, failed to argue a key witness for the State committed perjury, and failed to contact witnesses from a later shooting involving the murder weapon.

The State agreed to an evidentiary hearing, but limited to trial counsel's failure to object to lay testimony regarding a gunshot residue test (GSR test) performed on defendant. The judge denied an evidentiary hearing on defendant's remaining claims. In a written opinion, the judge rejected all of defendant's claims and denied PCR. This appeal followed.

II.

We derive the following facts from the trial record. At 12:30 a.m. on July 5, 2011, a man approached Robinson and his fiancé, A.N.,[1] as they sat on the front porch of Robinson's home on Osbourne Terrace in Newark. After a brief conversation, this man pretended to leave, only to turn around and begin firing a

_____

[1] We use initials to protect the identities of the surviving victim and another witness.

handgun, striking both Robinson and A.N. Within minutes, ambulances rushed Robinson and A.N. to a local hospital. Robinson died a few hours later but A.N. survived, after surgeons removed a bullet from her stomach. A .40 caliber bullet removed from Robinson's body matched casings investigators found at the scene. Police canvassed the area, but found no eyewitnesses other than A.N.

According to Essex County Det. Tyrone Crawley, he spoke with A.N. on July 8, in her hospital room, where she told him, "Raheem Cleveland shot me and my boyfriend." Regarding Cleveland, she told him, "I have known him for two years." Det. Crawley did not record the interview nor did he take any notes. After A.N.'s release from the hospital, Det. Crawley contacted her and told her he "would like to take a statement from her," and she agreed. On July 12, Det. Crawley and his partner transported A.N. to the Essex County Prosecutor's Office for an interview. In a video-taped interview, the detectives showed A.N. a photograph of defendant, which she signed, identifying defendant as the shooter. Det. Crawley stated he did not show A.N. any other photos since she previously identified defendant by name, and said she knew him for two years.

According to Det. Crawley, the interview began ten minutes after A.N. entered the interview room of the Homicide Unit, and no preliminary interview occurred before he turned on the video camera. Police arrested defendant the

same day. A search of defendant's home, pursuant to a warrant, failed to produce any evidence linking him to the shooting.

The day before police arrested him, defendant and seven other people sustained gunshot wounds in a drive-by shooting (the July 11 shooting) in Newark. The drive-by shooting occurred approximately two hours after Robinson's funeral, which defendant attended, and .40 caliber shell casings found at the scene matched the shells used to shoot Robinson; in addition, the casings matched a previous shooting from 2009. Police investigation of the July 11 shooting indicated the drive-by shooter left .223 caliber Remington shell casings.

Several hours after the July 11 shooting, investigators performed a GSR test on defendant at a local hospital, where he had been transported for treatment of his gunshot wound. The test yielded a negative result.

On July 22, A.N. contacted Det. Crawley and told him, "The person that shot me was Gerald Moore," not defendant. She also told him she would no longer cooperate with the investigation. According to Det. Crawley, he investigated A.N.'s identification of Moore as the shooter, and found no connection between Moore and either shooting.

Before opening statements, the trial judge found A.N.'s video-taped statement reliable and ruled the statement admissible, in light of A.N.'s recantation.

During Det. Crawley's testimony, the judge also allowed the State to present A.N.'s July 8 statement to rebut A.N.'s "allegations of police misconduct."

At trial, A.N. continued to identify Moore as the shooter; regarding defendant, she claimed to have known defendant her "whole life," describing him as "[c]ool, civil, like a brother to me." A.N. testified defendant did not commit the shootings, explaining she only said he did because the police "made me say it was him numerous times." She further testified that during her interview, the detectives showed her a photograph of "the wrong guy"; nevertheless, she signed and dated the photograph and wrote "Raheem" on the back of it because the police threatened to arrest her, after holding her in an interview room for seven hours. She also claimed, "I was recorded about eight times."[2]

A.N. also attacked her photo identification of defendant by suggesting another person previously identified defendant as the shooter to the police:

> [W]hen you brung me down to the statement he already
> had his picture. You had someone else questioned
> before me because if you going to ask me you supposed
> to have a line up of people, not just one picture. So the

---

[2] A.N. further testified that a close family friend, G.G., saw blood on her nightgown when he picked her up following her interview on July 12. A.N. said she told G.G. that the police interrogated her and made her sign a photograph of defendant, who was not the shooter. The State responded to A.N.'s claims by calling G.G. as a rebuttal witness. G.G. testified that when he picked up A.N. at 3:30 p.m., she was not bleeding, he saw no blood on her clothing, and she did not tell him the police coerced or mistreated her.

person that you all took down there to question picked him out first . . . .

Defense counsel objected to this testimony, and then A.N. essentially repeated the same claim. Defense counsel did not object when A.N. repeated her claim nor did he move to strike the testimony or request the judge to instruct the jury concerning it. Eventually, A.N.'s video-taped statement was played for the jury, over loud and vehement objections from A.N.[3]

On cross-examination, Det. Crawley admitted that in his testimony before the Grand Jury, he presented a theory that when defendant was shot on July 11, he shot back. In support of this theory, he cited the ballistic match between the .40 caliber shell casings found in the area where defendant was shot on July 11, and the .40 caliber shell casings found near the area where Robinson was shot on July 5, emphasizing that "it was a match to the same gun that was used to kill Marquis Robinson."

Det. Crawley also testified that he had no knowledge as to how the GSR was performed on defendant after the drive-by shooting; nevertheless, he stated, "I do

_____

[3] We note defendant's appendix did not include A.N.'s video-taped statement and other important parts of the record, contrary to Rule 2:6-1(a)(1)(I). We stress the importance of including those parts of the record that "are essential to the proper consideration of the issues" raised. Ibid. The failure to provide a complete record of items often impedes appellate review. See Johnson v. Schragger, Lavine, Nagy & Krasny, 340 N.J. Super. 84, 87 n.3 (App. Div. 2001).

know it's unreliable.  It's just an unreliable test."  Defense counsel did not object; however, he did get Det. Crawly to concede his office continues to use the test.

After the State rested, the defense presented testimony from one witness, Essex County Investigator Telmo Sivestri, who testified regarding the crime scene at the July 11 shooting.  On cross-examination by the assistant prosecutor, and without objection, Silvestri agreed the GSR test is "highly" inaccurate and added that he does not use it "personally."

After deliberating for approximately ninety minutes, the jury sent the judge a note requesting to review the testimony of A.N. and Det. Crawley.  At the judge's direction, the court reporter read the entire testimony of A.N. and Det. Crawley for the jury.  After another hour of deliberation, the jury returned its verdict.

On his direct appeal, defendant argued: 1) the judge erred in admitting A.N.'s prior statements; 2) the judge erred in admitting the testimony of Det. Crawley regarding the GSR test; 3) the judge imposed an excessive sentence; and 4) prosecutorial misconduct.  Cleveland, slip op. at 8-9.  We rejected these arguments and affirmed.  Id. at 2.  Regarding defendant's claim of error regarding the GSR testimony, we explained:

> Here, the record reveals that defense counsel introduced the topic of the July 11 shooting and the negative test results of defendant's GSR test because it was the cornerstone of defendant's theory of that case.

8

That is, defense counsel wanted the jury to know about the negative results of the test because it supported the defense theory that defendant never possessed the handgun and that someone else shot Marquis and [A.N.] This is presumably why defense counsel did not object to the officers' qualifications to render the opinions, or to their testimony about the test's reliability. If, as defendant contends, "[t]he real issue in this matter is the lack of objection from the trial attorney," this issue is better suited for a PCR petition.

[Cleveland, slip op. at 18.]

Defendant then filed the petition for PCR under review. Notwithstanding our comment regarding trial counsel's lack of objection to the GSR testimony, the PCR judge decided to conduct only a limited evidentiary hearing, where the judge only heard testimony regarding the reliability of GSR testing, without allowing defendant to present the testimony of trial counsel or any other witnesses.

At the hearing, defendant produced Carl Leisinger, a retired State Police Major, as a ballistics expert, to testify about GSR testing, including the Blue View GSR test kit used on defendant following the July 11, 2011 shooting. According to the PCR judge, "[Major] Leisinger explained that [GSR] on someone's hand indicates that the person fired a gun, was near someone who fired a gun or handled a gun that had been fired." A person administering a GSR test does need any particular training, only the ability to follow the directions provided in the GSR test kit.

Major Leisinger described the GSR test as a presumptive test, meaning the test is used based on the presumption the test subject has come in contact with a gun, and that the test result will likely yield a positive result. The State presented testimony from Det. Frank Ricci, who completed various tests using the Blue View kit. While most of his test results were negative, the record reflects Det. Ricci failed to follow the instructions provided in the kit.

The PCR judge found Major Leisinger credible and accepted his conclusion "that the Blue View testing kit is reliable. Unlike the testifying police officers, [Major] Leisinger's opinion was based on and supported by facts and data and he provided the why and wherefore for his opinion."

Notwithstanding Det. Ricci's noted failure to follow the instructions for using the Blue View kit, and his acknowledgment that he never saw the report written by the officer who administered the GSR test on defendant, the PCR judge found his testimony "credible[,] . . . reasonable and consistent." The judge also cited Det. Ricci's testimony as supporting Det. Crawley's "opinion that . . . Blue View is not reliable," and concluded, "As Det. Crawley offered a legitimate lay opinion, his testimony was admissible. An objection would have been properly overruled."

In reviewing the file, PCR counsel discovered an August 14, 2011 Star-Ledger article entitled "The Killing Cycle: Inside story of the Essex County homicide squad

as it tries to break the murder chain."  The article included many details of the investigation that lead to defendant's arrest for the killing of Marquis Robinson, including a detailed account of the interview of A.N. conducted at the police station. As included in the PCR judge's opinion, the account contradicts significant portions of Det. Crawley's testimony regarding A.N.'s interview:

> The witness, who is black, is first questioned by two white detectives.  A picture of Cleveland is produced, but the witness says, "That ain't him."
>
> "You're lying," one detective says.  "I tell by your eyes, you panic the second you saw him.  You know it's him. You already told us it's him."
>
> It is the beginning of a two-hour process using the tried-and-true tactic of good cop, bad cop.  For much of the time, the witness sits alone in an interrogation room not much bigger than a walk-in closet, furnished with two metal chairs and a metal table.
>
> At times the detectives work together.  Sometimes they separate, and one will watch the interview from a spy room.  They make alternate appeals to the witness's conscience, and safety.
>
> The good cop offers "the Disney package," homicide unit vernacular for protective custody, since most takers head south to live with relatives.  The witness shakes him off.
>
> At one point, the bad cop says, "What do you think this guy is going to come back to finish the job?  You know whose homicide is next?  Yours.  Don't you understand that?  Do the right thing."

11

The witness yells back, "I'm scared."

The good cop counters in a calm reassuring voice. "Look, we're just trying to help you. But when you walk out that door, there's nothing we can do to protect you if you don't help us get this guy off the street."

Finally the white detectives leave and Crawley, who is black, returns. He, too, tells the witness the police need help to get killers off the street. He acknowledges the witnesses fear.

"We know you're scared, we know you're scared. We're trying to help you not be scared."

The witness slowly nods. Tears form, and run down the witnesses face. Crawley pushes the picture of Rahim Cleveland toward the witness.

"Is this the guy?"

The witness nods yes, very slowly, but emphatically.

"Yes. Yes. That's him."

The detectives call it good cop, bad cop, white cop, black cop.

Det. Crawley testified he brought A.N. to the police station thirty minutes before her interview and said she was in the interview room for ten minutes prior to her video-taped statement; in addition, he disclaimed any knowledge of anyone questioning A.N. before her video-taped interview. PCR counsel argued that trial

counsel was ineffective for not using the information in the article to impeach Det.

Crawley's credibility. According to the PCR judge, defendant

> attempted to obtain certifications from the Star Ledger
> reporter and law enforcement officers believed to have
> been involved in the questioning of [A.N.] The law
> enforcement officers have not complied with
> defendant's requests and the reporter has asserted his
> privilege. [Defendant requested] a hearing for which
> subpoenas would be issued to these parties.

Notwithstanding the compelling account contained in the article and its clear

relevance to key issues in the case, the PCR judge denied defendants request for a

hearing and the issuance of subpoenas to the parties present for A.N.'s interrogation.

The judge explained that "trial counsel developed [A.N.'s] claim of police coercion

leading to her identification of [defendant]." Ultimately, the judge denied

defendant's petition. This appeal followed. On appeal, defendant raises the

following arguments:

> Point One - THE PCR COURT ERRED BY DENYING DEFENDANT'S
> PETITION FOR POST-CONVICTION RELIEF
> REGARDING THE ADMISSION OF IMPROPER LAY
> OPINION, AND BY DENYING DEFENDANT'S PETITION
> WITH REGARD TO THE HEARSAY STATEMENTS OF
> [A.N.], WITHOUT AFFORDING HIM AN EVIDENTIARY
> HEARING.
>
> A. THE PREVAILING LEGAL PRINCIPLES REGARDING
> CLAIMS FOR INEFFECTIVE ASSISTANCE OF COUNSEL,
> EVIDENTIARY HEARINGS AND PETITIONS FOR
> POST-CONVICTION RELIEF.

13

B.   Failure to Object to Improper Lay Opinion.

C.   Failure to Object to [A.N.'s] Hearsay Statement.

III.

We begin by summarizing the trial court's obligations in resolving petitions for PCR.  When petitioning for PCR, the defendant must establish by a "preponderance of the credible evidence" that he or she is entitled to the requested relief.  State v. Nash, 212 N.J. 518, 541 (2013) (quoting State v. Preciose, 129 N.J. 451, 459 (1992)).  To establish a prima facie claim of ineffective assistance of counsel, the defendant must show the particular manner in which counsel's performance was deficient, and also that the deficiency prejudiced his right to a fair trial.  Strickland v. Washington, 466 U.S. 668, 687 (1984).

When deciding a petition for PCR, the court must "make specific fact findings as required by Rule 1:7-4(a) and state [its] conclusions of law" on each of the defendant's contentions.  State v. Thompson, 405 N.J. Super. 163, 172 (App. Div. 2009); see also Rule 3:22-11.  "Anything less is a 'disservice to the litigants, the attorneys, and the appellate court.'"  Thompson, 405 N.J. Super. at 172 (quoting Curtis v. Finneran, 83 N.J. 563, 569-70 (1980)).

While the court need not author a lengthy written opinion, or deliver an hour-long oral ruling in every case, it must always state what specific facts formed the basis of the decision, and then weigh and evaluate those facts in light of the governing law "to reach whatever conclusion may logically flow from" those facts. Slutsky v. Slutsky, 451 N.J. Super. 332, 357 (App. Div. 2017). Because justice requires no less, "[a]ll conclusions must be supported." Ibid.

The mere raising of a claim for PCR does not entitle the defendant to an evidentiary hearing, and the defendant "must do more than make bald assertions that he [or she] was denied the effective assistance of counsel." State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999). However, an evidentiary hearing should be conducted where the defendant has established a prima facie showing in support of the requested relief. Preciose, 129 N.J. at 462.

When determining whether to grant an evidentiary hearing, the trial court must consider the facts in the light most favorable to the defendant. Id. at 462-63. "If there are disputed issues as to material facts regarding entitlement to post-conviction[]relief, a hearing should be conducted." State v. Russo, 333 N.J. Super. 119, 138 (App. Div. 2000). We review a trial court's decision to grant or deny a defendant's request for a hearing under an abuse of discretion standard. Id. at 140.

Applying these principles, we conclude the PCR judge mistakenly exercised his discretion by granting defendant only a limited evidentiary hearing. As a result, the judge did not have the testimony of critical witnesses, including defendant's trial counsel. The judge needed this testimony to competently address the issues raised by defendant. In addition, the PCR judge failed to make adequate findings and conclusions concerning the issues related to GSR testing.

The issues presented by defendant's petition included trial counsel's reasons for not objecting to A.N.'s testimony regarding an alleged unidentified witness as hearsay and for not objecting to Det. Crawley's and Inv. Silvestri's opinions regarding the reliability of the GSR test. The issues also involved the Star-Ledger article, and trial counsel's explanation for not using the information and witnesses identified in the article to impeach Det. Crawley's testimony.

Both the State and United States Constitutions guarantee a criminal defendant the right to confront "the witnesses against him." U.S. Const. amend. VI; N.J. Const. art. I, ¶ 10. The right of confrontation is an essential attribute of the right to a fair trial, requiring that a defendant have a "fair opportunity to defend against the State's accusations." State v. Garron, 177 N.J. 147, 169 (2003) (quoting Chambers v. Mississippi, 410 U.S. 284, 294 (1973)). A

16

defendant exercises his right of confrontation through cross-examination, which courts have described as the "greatest legal engine ever invented for the discovery of truth." California v. Green, 399 U.S. 149, 158 (1970) (quoting 5 Wigmore on Evidence § 1367); see also Pointer v. Texas, 380 U.S. 400, 404 (1965).

"When the logical implication to be drawn from the testimony leads the jury to believe that a non-testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." State v. Branch, 182 N.J. 338, 349 (2005) (quoting State v. Bankston, 63 N.J. 263, 271 (1973)). A.N. testified that someone else identified defendant before she was shown his photo. While trial counsel initially objected, he did not object when defendant repeated the claim nor did he move to strike or request a jury instruction.

Without testimony from trial counsel, we cannot determine if his limited response represented calculated strategy or ineffective assistance. A full evidentiary hearing would likely provide insightful explanations for the court.

We also conclude the PCR judge made conflicting findings and conclusions regarding the reliability of the GSR test. The judge found the testimony of Major Leisinger credible and accepted his conclusion "that the Blue View testing kit is reliable." However, in the same opinion, the judge stated he found

Det. Ricci's testimony "credible[,] . . . reasonable and consistent," and cited his testimony as supporting Det. Crawley's "opinion that . . . Blue View is not reliable."

At another point, the judge stated the opinions of Det. Crawley and Inv. Silvestri "about the reliability the gunshot residue test were rationally based on their perceptions and experiences." However, the judge later noted that Inv. Silvestri "testified that he did not use the Blue View and kit did not have personal knowledge of it. Therefore he was not qualified to offer an opinion on the reliability of the test."

Regarding Det. Crawley, the judge found his "lay opinion was admissible . . . . based on his perceptions as a police officer who had decades of experience investigating crime scenes involving the firing of weapons." But when asked at trial if he was aware of the "particulars of the handgun residue test" performed on defendant, Det. Crawley responded "no," and was unsure where or when the test was administered. Significantly, Det. Crawley did not testify that he had used the test before, knew the procedures for using the test, nor make any other comments relating to the test other than to dismiss it as "unreliable."

We also note the potential importance of the information and witnesses identified in the Star-Ledger article. The jurors requested to have the testimony of just two witnesses, A.N. and Det. Crawley, read back to them. The verdict in the case indicates the jury chose to credit Det. Crawley's testimony and reject

A.N.'s recantation and claims of coercion. Trial counsel may or may not have good reasons for not utilizing the Star-Ledger article. A full evidentiary hearing should provide an explanation.

Viewing the relevant facts in the light most favorable to defendant, they presented a credible prima facie case of ineffective assistance and resulting prejudice. We therefore conclude a full evidentiary hearing was required. On remand, the court shall conduct a full evidentiary hearing, review all of defendant's claims, and render a new decision, supported by specific findings of fact and conclusions of law concerning each claim.

While there may have been strategic reasons to justify trial counsel's decisions in the case, an evidentiary hearing, including the testimony of defendant's former counsel, if available, was required to develop a proper record. In remanding this matter, we make clear that nothing within this opinion forecasts any views on the merits of any of defendant's arguments nor on the question of whether his trial or appellate attorneys provided him with ineffective assistance under the Strickland test.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3259-17T4