**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2453-16T1

DEBORAH CARR,

       Plaintiff-Respondent/
       Cross-Appellant,

v.

HARRY CARR,

       Defendant-Appellant/
       Cross-Respondent.

_____

       Argued October 2, 2019 – Decided October 29, 2019

       Before Judges Yannotti, Hoffman and Firko.

       On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0937-06.

       Harry Carr, appellant/cross-respondent, argued the cause pro se.

       James P. Yudes argued the cause for respondent/cross-appellant (James P. Yudes, PC, attorneys; James P. Yudes, of counsel; Karen Tichenor Willitts, on the briefs).

PER CURIAM

Defendant appeals from an order dated June 29, 2016, and other orders entered by the Family Part in these divorce proceedings. Plaintiff cross-appeals from the June 29, 2016 order. For the reasons that follow, we affirm on the appeal and cross-appeal.

I.

The parties were married in May 1988 and thereafter adopted a child, who we refer to as A.C. Plaintiff filed a complaint for divorce on April 27, 2006. Thereafter, defendant filed an answer, a counterclaim for divorce, and a third-party complaint in which he asserted claims against plaintiff's parents and sisters. The third-party claims were later resolved. Thereafter, the judge conducted a trial in the matter on fifty-five non-consecutive days and filed a comprehensive written opinion, which was memorialized in a final judgment of divorce (FJOD), dated June 29, 2011.

Among other things, the FJOD provided for the equitable distribution of the parties' assets, including defendant's ownership interest in HM, LLC (HM), a business that purchased, sold, and leased aircraft for charter services; awarded plaintiff permanent alimony in the amount of $10,000 per month; required defendant to pay child support of $500 per month, provide health insurance

2

coverage, and pay certain uninsured healthcare expenses for A.C.; ordered defendant to maintain his "current life insurance policy" with plaintiff and A.C. named as beneficiaries; and awarded plaintiff attorneys' fees in the amount of $300,000.

Plaintiff and defendant appealed from the FJOD. While the appeal was pending, defendant filed an application in the Family Part to terminate or reduce alimony based on changed circumstances. The trial court deferred consideration of the motion.

We affirmed the FJOD in large part, but remanded the matter to the Family Part to: complete a child support worksheet; provide a more detailed explanation of the award of attorneys' fees; conduct a full valuation and equitable distribution of HM; and consider plaintiff's claim for distribution of a share of an account with Bank of America. Carr v. Carr, No. A-5558-10 (App. Div. Oct. 11, 2013) (slip op. at 33, 35, 45, 54).

On June 30, 2014, the trial judge issued her decision on child support, the Bank of America account, and the award of attorneys' fees. On July 18, 2014, another Family Part judge granted defendant's application for a plenary hearing on his alimony motion and reduced alimony to $5900 per month, pendente lite, without prejudice.

3

On June 12, 2015, the judge consolidated the hearing on defendant's motion with the trial on the valuation and distribution of HM. The parties also asserted certain other demands for relief. The judge appointed Jeffrey D. Urbach, a certified public accountant, to serve as the court's expert for the valuation of HM. On February 1, 2016, the judge denied defendant's motion for her disqualification and a change of venue. The judge thereafter conducted a trial over seventeen non-consecutive days.

On June 29, 2016, the judge filed her opinion and order. The judge found that defendant's ownership interest in HM had a value of $149,000 as of the valuation date, based on the opinion of plaintiff's expert, certified public accountant R. Joseph Gunteski. The judge distributed defendant's ownership interest in HM and all of the company's outstanding debt to defendant. The judge ordered defendant to pay plaintiff $243,764, which was her share of the marital funds defendant had dissipated.

The judge also reinstated defendant's alimony obligation to $10,000 per month retroactive to July 18, 2014. In addition, the judge ordered defendant to obtain and maintain a life insurance policy with a death benefit sufficient to ensure full payment of his alimony and child support obligations. The judge

4

awarded plaintiff $50,000 in attorneys' fees for the second trial. Thereafter, the trial judge retired.

On October 17, 2016, another Family Part judge entered an order denying defendant's motions for reconsideration, for a mistrial, and to reopen and supplement the record. On January 13, 2017, the judge denied defendant's motion for reconsideration of the October 17, 2016 order. Defendant's appeal and plaintiff's cross-appeal followed.

II.

We turn first to defendant's contention that the trial judge erred by denying his motions for her disqualification and a change of venue.

The record shows that after the judge filed the FJOD, she was transferred to the Criminal Part. Consequently, another Family Part judge assumed responsibility for certain post-FJOD motions in this case, and defendant filed a motion for that judge's disqualification. The Family Part judge denied the motion and defendant appealed.

In an unpublished opinion, we held the judge was disqualified and should have recused herself. Carr v. Carr, No. A-6393-11 (App. Div. June 20, 2013) (slip op. at 2). We vacated the judge's orders and remanded the issues addressed in those orders for consideration by another judge. Ibid.

A-2453-16T1

The judge who presided at the first trial later returned to the Family Part and again assumed responsibility for this case. Just prior to the scheduled trial date, defendant filed a motion for the judge's disqualification and transfer of the case to another vicinage. Defendant argued that in the prior proceedings, the judge had made certain credibility findings, which he believed indicated she could not handle the case in a fair and impartial manner.

Defendant also claimed the previously-disqualified Family Part judge had remained involved in the case by assigning his alimony motion to the trial judge. In addition, defendant asserted he could not receive a fair and impartial trial before the trial judge or any other judge in the vicinage. The trial judge denied the motion.

In a decision placed on the record, the judge stated that her findings about defendant's credibility were based on discrepancies between his statements and the evidence, and her decisions were based on the record and the applicable law. The judge commented that she had "no animosity" toward defendant, and that the Assignment Judge for the vicinage had assigned the case to her, not the disqualified judge. She also stated that the case had been pending in the county for ten years, and a transfer of the matter to another vicinage would "cause delay and hardship for both parties."

6

On appeal, defendant does not specifically take issue with the judge's decision. Instead, he argues that the judge improperly "testified" as to the scope of Urbach's assignment as the court-appointed valuation expert. However, the judge's remark regarding the scope of Urbach's engagement was not improper testimony, but rather a summary of Urbach's testimony. Furthermore, there is nothing in the record which suggests that the trial judge could not handle this case fairly and objectively.

Defendant further argues that the judge lacked "the requisite jurisdiction or delegation" under Rule 4:3-3(a) to rule on his venue-transfer motion. He also argues that the failure to transfer venue "tainted the entire trial." Again, we disagree.

Rule 4:3-3(a) states that a change of venue can be ordered for various reasons, including a "substantial doubt" that a fair trial may be had in a given location. Here, there was no basis for defendant's claim that the matter could not be tried fairly in Somerset County.

Moreover, the rule states that a change of venue may be ordered by "the Assignment Judge or the designee of the Assignment Judge of the county in which venue is laid . . . ." Ibid. The rule contemplates that venue will not be changed except by order of the Assignment Judge, or a judge designated by the

A-2453-16T1

Assignment Judge to change venue. Here, venue was not changed, and the rule did not preclude the trial judge from ruling on the motion.

III.

Next, defendant argues that the judge erred by consolidating the hearing on his alimony motion with the trial on the valuation and distribution of HM. He contends the judge's decision to consolidate these matters was an abuse of discretion and evidence of a pre-determined outcome. He asserts the law applicable to these decisions is different, and that the facts relevant to these two matters were "literally a decade apart."

Rule 4:38-1 provides that on its own motion or the motion of a party, the court may consolidate "actions involving a common question of law or fact arising out of the same transaction or series of transactions." The decision to consolidate two or more matters for a single trial "lies within the discretion of the trial court," and should not be set aside "unless the lower court pursued a 'manifestly unjust course.'" Union Cty. Improvement Auth. v. Artaki, LLC, 392 N.J. Super. 141, 149 (App. Div. 2007) (quoting Gittleman v. Cent. Jersey Bank & Tr. Co., 103 N.J. Super. 175, 179 (App. Div. 1967)).

Here, the judge's decision to consolidate the hearing on the alimony motion with the trial on the valuation and distribution of HM was not a mistaken

exercise of discretion. As the judge pointed out in her decision, the issues pertaining to alimony and equitable distribution were intertwined. Therefore, it was reasonable for the court to consolidate these related matters for trial. Defendant's assertion that the judge's decision to consolidate the matters was evidence of a pre-determined outcome is patently without merit.

IV.

We turn to defendant's contentions regarding the judge's decision on valuation and distribution of HM.

A. The Trial Court's Opinion.

In her opinion, the judge discussed the methods that Urbach and Gunteski employed to value HM. Urbach testified that in the business-valuation industry, there are three generally-accepted methods for valuing a business: the market approach, the income approach, and the asset approach.

Urbach used a variation on the asset approach to value HM, and he relied primarily on HM's partnership tax returns as a basis for his analysis. Urbach did not, however, perform a forensic examination of HM's books and records to verify the accuracy of the information in the returns. He explained that his retainer agreement with the court did not include such an examination.

Gunteski chose the income approach for his analysis. He explained that he did so because HM was still in business on the valuation date, and at that time, defendant and his partner were committed to continuing its operation. Gunteski testified that he rejected the asset approach because he had misgivings about the information that defendant had provided. He stated that the asset approach ignored the income that the business was still generating. Gunteski further testified that the use of the book values from a business's tax returns does not reflect the fair value of those assets.

The judge noted that Gunteski had "performed some forensic work," as part of his valuation analysis. He had examined both sets of HM's books and attempted to verify entries therein using records of capital accounts and other documents that defendant and his partner had produced in discovery. The judge found that Gunteski based his analysis on more sources than Urbach and had "a better chance at determining more accurate numbers."

The judge stated that Gunteski's report was "more in line with methodologies for business valuations [which are] accepted as reliable within [the] industry." The judge also stated that Gunteski did not advocate for plaintiff or "draw inferences adverse to [defendant]" when performing his analysis. The

judge noted that Gunteski "simply worked around the gaps in [the] ledgers and account statements."

The judge found Gunteski's use of the income approach, which took into consideration that HM was still operating when the complaint was filed, "comport[ed] more with the facts" than Urbach's opinion that the company was "dead" at that time. The judge credited Gunteski's observation that HM was earning income on the valuation date, and noted that Urbach's valuation methodology could not take this factor into account. The judge accepted Gunteski's opinion that defendant's ownership interest in HM had a value of $149,000 on the valuation date.

The judge then addressed the equitable distribution of HM. She found that she was bound by her prior analysis of the factors in N.J.S.A. 34:23-1, "with the exception of the findings on dissipation of marital assets and debt," which this court had "specifically vacated and directed this court to address." The judge noted that the assets distributed to plaintiff had yielded $11.5 million instead of the $5 million previously anticipated.

The judge also noted that the equitable distribution of the parties' real estate ordered by the FJOD "favored [plaintiff] by a factor of two to one," and this had been based in part upon defendant's failure to account for $8.8 million

A-2453-16T1

in marital funds. The judge found that the value of defendant's interest in HM was "small" by "comparison to the other assets equitably distributed," and the distribution of HM had no "appreciable impact" on the overall equitable distribution scheme established in the FJOD.

In addition, the judge addressed HM's debt, which consisted of the obligation to repay loans from PNC Bank for the purchase of aircraft. The judge stated that to the extent that the company's $37,315,604 pre-complaint debt was "a debt apart from the value of HM," it was subject to distribution. The judge found, however, that Gunteski had taken HM's debt into account in his valuation of the company.

The judge pointed out that HM's value would have been "substantially greater" if Gunteski had not factored the debt in his analysis. The judge also pointed out that PNC Bank brought suit to enforce payment of the debt, which defendant and his partner had personally guaranteed. The bank had offered to settle the matter for a small fraction of the debt, but defendant and his partner had not accepted that offer.

The judge then summarized her findings on the equitable distribution of HM, noting that certain facts carried weight in her analysis:

> The first fact is the minimal value of HM in the entire equitable distribution scheme in this case. The second

is that the value of HM is a paper value only, as HM ceased to operate in late 2010 or early 2011. The third is [defendant's] personal guarantee of the aircraft debt which, although it was incorporated into the value of HM, survives HM's demise and is almost as large as the entire marital estate at the time of trial. The fourth is the willingness of PNC Bank to come to a compromise resolution of the aircraft debt lawsuit. The fifth consideration is that [defendant] now has a job and salary as the CEO of a company that has the potential, in his words, to make him a lot of money. This fact mitigates the weight of [defendant's] potential liability for the enormous PNC debt. The final fact is [plaintiff's] successful liquidation of the four substantial real properties, resulting in her receiving $11 million in cash from the marital estate. Taking these facts and circumstances into account, along with the other considerations identified in the court's first trial opinion, the court distributes HM, LLC, including the PNC debt, entirely to [defendant].

B. Scope of Review.

The scope of our review of the trial court's findings of fact is "limited." Cesare v. Cesare, 154 N.J. 394, 411 (1998). An appellate court should not disturb such findings unless they "are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974).

Furthermore, our deference to the trial court's fact-finding is "especially appropriate 'when the evidence is largely testimonial and involves questions of

13

credibility.'" Cesare, 154 N.J. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). Deference is warranted because a trial court "hears the case, sees and observes the witnesses, [and] hears them testify," Gallo v. Gallo, 66 N.J. Super. 1, 5 (App. Div. 1961). Therefore, the trial court "has a better perspective than a reviewing court in evaluating the veracity of witnesses." Pascale v. Pascale, 113 N.J. 20, 33 (1988).

We also accord deference to fact-finding by the Family Part because of its "special jurisdiction and expertise in family matters." Cesare, 154 N.J. at 413. However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

C. Defendant's Arguments.

1. Remand Instructions.

Defendant argues that the trial judge did not comply with our remand instructions. He asserts that in our previous opinion, we ordered the trial court to address all claims related to the distribution of HM, and to determine whether the decisions on those claims required changes to other provisions of the FJOD.

Defendant contends the trial court's decision regarding HM "changed equitable distribution materially" by "tens of millions of dollars[.]" He also

14

contends the trial court erred by failing to find that no changes in the FJOD were required and the resulting distribution is fair and equitable.

We are convinced, however, that the trial court fully complied with our remand instructions and made all required findings of fact. In our opinion, we stated that if further fact-finding beyond the valuation and distribution of HM was "warranted," the court could change other provisions of the FJOD accordingly. Carr, No. A-5558-10, at 54. We did not require the trial court to make such changes.

We are convinced that the judge's findings regarding HM did not require any other changes to the overall scheme of equitable distribution established by the FJOD. As noted, the judge found that the value of defendant's interest in HM represented a relatively small percentage of the marital estate and that it would have "no appreciable impact" on equitable distribution scheme as a whole. Moreover, the record shows that PNC Bank is willing to compromise on HM's debt.

2. Alleged Need For Other Specific Findings.

Defendant argues that the trial judge erred by failing to make specific findings regarding the marital funds that were not accounted for, and the value of assets previously distributed to plaintiff. In her opinion, the judge stated that

the amount of the unaccounted-for funds was about $7.5 million, rather than $8.8 million as initially thought. The judge also noted that plaintiff had received $11.5 million from the sale of four properties distributed to her, rather than the anticipated $5 million. As stated previously, the judge found for the reasons stated in her opinion that the distribution of defendant's interest in HM and its debt did not warrant a change in the overall scheme of equitable distribution.

We are convinced the trial court was not required to make more specific findings regarding the unaccounted-for monies, or the value of the assets distributed to plaintiff. Defendant's arguments on this point lack sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

### 3. Acceptance of Gunteski's Opinion on HM's Valuation.

Defendant argues that the judge erred by accepting Gunteski's valuation instead of Urbach's. He asserts the judge incorrectly found that Gunteski's opinion was supported by a forensic examination of HM's books and tax returns. According to defendant, Gunteski relied on "the very same HM tax returns" that Urbach relied on for his analysis.

Defendant further argues that Gunteski's opinion that HM was a "going concern" on the valuation date was not based on credible evidence. He asserts Gunteski did not consider that HM had almost $40 million in debt at that time.

16

He maintains Urbach's opinion that HM had no value on the valuation date had better factual support. He also contends the judge should have rejected Gunteski's opinion because Gunteski was "an advocate not an expert."

It is well-established that "a factfinder may accept or reject expert testimony in whole or in part." Slutsky v. Slutsky, 451 N.J. Super. 332, 357 (App. Div. 2017). Where expert opinions differ, the trial judge is free to decide which opinion the judge finds more credible and better supported, and in doing so, the judge "need not adopt the opinion of either expert in its entirety." Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002).

The judge must weigh and evaluate "the evidence to reach whatever conclusion may logically flow from the aspects of testimony the court accepts." Slutsky, 451 N.J. Super. at 357. An expert's opinion is "entitled to no greater weight than the facts and reasoning upon which it is based." Todd v. Sheridan, 268 N.J. Super. 387, 401 (App. Div. 1993).

Significantly, the valuation of businesses, particularly closely-held, small businesses, is "not an exact science," and in many cases "there is no right answer." Balsamides v. Protameen Chems., 160 N.J. 352, 368 (1999). A case-by-case analysis is required, "with sensitivity and adjustment for the particular

circumstances and the flexibility to deal with extraordinary circumstances." Brown, 348 N.J. Super. at 477.

In determining the value of a business, a court may accept the testimony of an expert who has utilized "any techniques or methods which are generally acceptable in the financial community and otherwise admissible in court." Balsamides, 160 N.J. at 375. Here, the market and income approaches used by Urbach and Gunteski are among the methods that have been recognized as acceptable. Id. at 363-66; Brown, 348 N.J. Super. at 478-79.

Notwithstanding defendant's arguments to the contrary, we are convinced the evidence supports the trial court's finding that Gunteski's analysis was more persuasive and convincing than Urbach's analysis. The judge found that Gunteski's valuation was more in line with "methodologies for business valuations accepted as reliable within the industry."

She observed that Gunteski had based his analysis on numerous sources of information. He reviewed available underlying records, which allowed him to make a more accurate valuation than he would have made if he relied on the business's tax returns, as Urbach had done.

In addition, the judge commented that Gunteski's approach "avoided pure speculation" about monies going in and coming out of HM. She stated that

Gunteski "avoided the pitfall of frequent advocacy which marred the HM valuation at the original trial." She also stated it was significant Gunteski "took a factually supported, conservative approach to selecting variables for the capitalization rate. His selections did not smack of advocacy, but rather aided the court in arriving at a decision that the court is confident is reasonable and fair."

We therefore reject defendant's contention that the judge erred by accepting Gunteski's analysis and opinion as to the value of HM. The record fully supports the judge's findings and conclusion that Gunteski's valuation was more thorough, better supported, and more accurate than Urbach's valuation.

4. Distribution of HM's Debt.

Defendant argues that the trial court erred by failing to distribute HM's debt equally between the parties. As stated previously, the judge found that because Gunteski's valuation of HM took its debt into account, HM's debt would be distributed along with defendant's interest in the company.

Defendant asserts Gunteski testified that he ignored the debt in his valuation approach, but the record does not support defendant's assertion. At trial, Gunteski testified that "in an income approach, the assets and liabilities are

A-2453-16T1

embedded in the valuation." He agreed that the valuation reflects the existence of that debt.

Defendant also argues that plaintiff should be responsible for half of HM's debt because she benefitted by using HM's aircraft for various trips, including trips she took after she filed for divorce. We disagree.

The judge reasonably found that HM's entire debt should be distributed to defendant, along with his interest in the company, and, as will be discussed later in this opinion, the judge provided defendant a credit for plaintiff's use of the aircraft. Although plaintiff made limited use of the aircraft, this did not require the judge to order plaintiff to assume responsibility for part of HM's debt.

We conclude the trial court did not err in its valuation and equitable distribution of HM and its debt.

V.

We next consider the arguments the parties have raised regarding the trial court's decision on defendant's dissipation of marital assets.

We note initially that N.J.S.A. 2A:34-23.1(i) requires that when a court equitably distributes marital assets, it should consider, among other things, contributions of each party to the dissipation of marital property. The statute does not define "dissipation," and "the concept is a plastic one, suited to fit the

demands of the individual case." <u>Kothari v. Kothari</u>, 255 N.J. Super. 500, 506 (App. Div. 1992).

A court may find dissipation where one spouse "'uses marital property for his or her own benefit and for a purpose unrelated to the marriage at a time when the marriage relationship was in serious jeopardy.'" <u>Ibid.</u> (quoting <u>Head v. Head</u>, 523 N.E.2d 17, 20-21 (Ill. App. 1988)). When determining whether a spouse's action constituted dissipation, courts have considered "a variety of factors," which include whether an expenditure was typical of those made by the parties prior to the breakdown of the marriage; whether it benefited the joint marital enterprise or was for only one spouse's benefit; and the need for and amount of the expenditure. <u>Id.</u> at 507.

Courts have also considered "whether the assets were expended by one spouse with the intent of diminishing the other spouse's share in the marital estate." <u>Ibid.</u> Because the dissipation analysis is fact-sensitive, a trial court's decision on this issue should only be reversed if shown to be an abuse of discretion. <u>Id.</u> at 506.

A. <u>The Trial Court's Opinion</u>.

Here, the trial judge found that after plaintiff filed her complaint, she obtained court orders requiring that certain liquid marital assets and the proceeds

from the sales of other marital assets be deposited in the Kovacs Trust Account (KTA). The court later authorized defendant to withdraw monies from the KTA as advances on his share of the equitable distribution.

The judge found that defendant's own analysis showed that he spent $5,658,265 in marital funds on HM post-complaint. In addition, defendant's testimony and exhibits established that defendant deposited $385,465 and $1,452,427 into his accounts after the advances from the KTA, and then spent these monies on HM. The judge subtracted these amounts from the total defendant spent on HM during the relevant period, and determined that the remainder, $3,820,373, "represent[ed] potential dissipation of marital assets."

The judge then considered when defendant should have known that HM was not viable and that spending marital funds on HM would be an untenable business judgment constituting dissipation. The judge noted that NextFlight Aviation, LLC, defendant's business that charted aircraft for HM, was sold in May 2007, and by the end of that year, defendant sought $2 million from the KTA for HM.

The judge found that although this disbursement was defendant's money and not marital funds, "the fact that HM could not hold its own in the aircraft chartering and trading business should have been plain" to him by that point.

22

Therefore, the judge found any marital funds defendant spent on HM after January 1, 2008, were dissipated funds.

Based on defendant's testimony and exhibits, the judge found that defendant spent a total of $524,868 of marital funds on HM during that time period. The judge awarded plaintiff sixty percent of these dissipated funds. The judge further found that defendant was entitled to a credit of $71,156 against plaintiff's share for the cost to HM of her use of aircraft during the litigation. After this adjustment, the judge ordered defendant to pay plaintiff the remaining $243,764 within two years.

B. Defendant's Arguments.

On appeal, defendant argues the trial court erred by finding he dissipated martial assets because plaintiff never produced an expert to support her dissipation claim. Here, however, Gunteski addressed plaintiff's dissipation claim in his testimony.

Defendant also argues the trial court erred by using January 1, 2008, as the starting point for dissipation. He contends that finding was "legally contradicted" by the court's adoption of Gunteski's valuation of HM because Gunteski testified that HM could have been "a saleable business" as late as 2012.

As we have explained, however, the trial court was free to accept or reject all or a part of Gunteski's testimony.  Slutsky, 451 N.J. Super. at 357.  There is sufficient credible evidence in the record to support the judge's finding that as of January 1, 2008, defendant should have known that HM was no longer a viable business and the use of marital funds on HM after that date constituted the dissipation of marital assets.

Defendant further argues that the court had permitted the release of funds to him from the KTA in 2009 so he "could run his business and generate income."  He asserts that the record shows this "business" was HM.  He therefore contends his expenditures were not dissipation.

The record shows, however, that the authorized disbursements from the KTA were advances of defendant's share of equitable distribution.  Those disbursements allowed defendant to use his own money on the business. The court did not authorize defendant to spend any other monies, including marital funds, for that purpose.

Defendant also contends the trial court should have barred plaintiff from asserting a dissipation claim because at times she used HM's aircraft.  The court found that plaintiff's use of HM's assets for personal vacations in the early post-complaint period "clouded" her dissipation claim, but this did not warrant

24

rejection of plaintiff's dissipation claim in its entirety. The court reasonably elected to give defendant a credit for plaintiff's use of the aircraft in the post-complaint period.

In addition, defendant contends the trial court erred by finding that he dissipated $524,868 in marital funds. He asserts the court took into account withdrawals from certain accounts during the relevant time period, but failed to give him credit for a $400,000 deposit he made into his Citigroup Smith Barney Account. We disagree.

Defendant submitted a list to the trial court, in which he states that he made withdrawals totaling $3,479,443.18 from his Citigroup account between June 20, 2006, and March 1, 2008. The list shows a withdrawal of $194,188.82 on March 1, 2008.

The trial court accepted defendant's list and concluded that the $3,479,443.18 withdrawn from the Citigroup account were marital funds that defendant spent on HM. The judge included the $194,188.82 in the $524,868, which the judge found were dissipated martial funds.

While the list also indicates defendant deposited $400,000 into the Citigroup account on February 1, 2008, defendant did not present any evidence to show that the $194,188.82 withdrawn from the account was anything other

than marital funds. Indeed, defendant testified at trial that all the money withdrawn from the Citigroup account was marital money. The judge did not err by failing to consider the deposit in her analysis.

Defendant also contends the court erred by reducing its finding of unaccounted funds from $8.8 million to $7.5 million rather than a lower number. Defendant contends the $8.8 million should have been reduced by the $5,658,265 he spent on HM. The argument is meritless. The judge reduced the $8.8 million by deducting the monies advanced to defendant from the KTA. A further reduction was not warranted.

C. Plaintiff's Arguments.

In her cross-appeal, plaintiff argues that because the trial court found that defendant spent $3,820,373 in marital funds on HM post-complaint, it erred by not awarding her fifty percent of that amount.

Plaintiff asserts a reasonable person would have realized that HM was a failing business in April 2006 when the complaint was filed. She therefore contends the court erred by basing its award to her on the amount defendant spent on HM beginning in January 2008.

We disagree with plaintiff's argument. We are convinced the record supports the court's determination that dissipation did not occur until after

January 1, 2008, which was when defendant should have known that HM was not a viable business.

In support of her argument, plaintiff relies upon Goldman v. Goldman, 265 N.J. Super. 452 (App. Div. 1994). In that case, the husband used several hundred thousand dollars in marital funds to meet "critical cash shortages" of his failing automobile business post-divorce complaint. Id. at 456-57. We affirmed the trial court's finding that this did not constitute dissipation because the husband spent the monies in a good faith effort to preserve a marital asset for the benefit of both parties. Id. at 457-58.

We stated, however, that our decision was based on "the particular situation presented," and "should not be construed as permission for one spouse to use marital funds as venture capital with impunity." Id. at 457. We noted that the wife had stipulated that her husband had not acted in bad faith, and she had presented no evidence showing that the amounts spent were unreasonable or that the business ultimately failed due to the husband's poor business judgment. Id. at 457-58.

Here, the judge explained that this case presented "even more unique circumstances" than those in Goldman. As we have explained, the judge awarded plaintiff sixty percent of the dissipated monies, and determined that the

27

monies were not dissipated until defendant should have known HM was no longer a viable business. Goldman does not preclude that result.

We conclude there is sufficient credible evidence in the record to support the trial court's finding that defendant dissipated $524,868 in marital funds. We also conclude that the court did not abuse its discretion by awarding plaintiff sixty percent of that amount, with a credit to defendant of $71,156 for plaintiff's use of HM's aircraft.

## VI.

We turn to defendant's argument that the trial court erred by denying his motion to terminate alimony. Defendant contends the court failed to make the required findings of fact for its decision.

A court has the equitable power to issue alimony orders following a judgment of divorce and to revise these orders as circumstances require. Crews v. Crews, 164 N.J. 11, 23 (2000). A trial court's alimony decision should not be set aside on appeal unless the court "clearly abused its discretion," did not consider controlling legal principles, made mistaken findings, or reached an unreasonable conclusion unsupported by the record as a whole. J.E.V. v. K.V., 426 N.J. Super. 475, 485 (App. Div. 2012).

N.J.S.A. 2A:34-23(b) provides that in any divorce action a court may award alimony. When doing so, the court must consider the factors enumerated in N.J.S.A. 2A:34-23(c) and "make specific written findings of fact and conclusions of law on the reasons" and "evidence" for its decision to award alimony. N.J.S.A. 2A:34-23(b). The court also may consider "any other factors which [it] may deem relevant." Ibid.

In her opinion, the judge addressed defendant's assertions of changed circumstances in detail. Defendant's W-2 forms supported the judge's finding that in 2014 and 2015, he earned more than the $380,000 imputed to him in the FJOD. Defendant's testimony also supported the finding that in 2016, he was making an amount reasonably close to $380,000 at Bay Microsystems.

Moreover, the court based its imputation of investment income to defendant on the amount he could earn by investing a portion of the $7,541,735 in funds that had not been accounted for. Defendant argues that in reaching that conclusion, the court ignored his case information statement (CIS), which he claims shows he does not have assets that could earn him the amount of investment income imputed to him. We are convinced, however, that the judge did not err by imputing investment income to defendant of $108,727.

Defendant also contends the judge erred when she calculated the investment income imputed to plaintiff. In calculating plaintiff's imputed investment income, the court used the same rate of return that it used in the FJOD, that is 2.5%. Therefore, defendant's assertion that the court used a 2.25% rate is incorrect. The judge imputed $108,727 in investment income to plaintiff, which is 2.5% of $4,349,093, the amount of plaintiff's liquid assets set forth in her CIS.

Defendant further argues that the judge erred by failing to impute investment income to plaintiff based on the $11.5 million she received in equitable distribution. Again, we disagree. The judge did not include the full value of these assets in her calculation because those monies were not available to plaintiff for investment at the time of the trial.

In addition, defendant contends the judge erred in her findings regarding the parties' lifestyles. We disagree. The record shows that defendant's monthly expenses are greater than plaintiff's, but this did not preclude the court from finding that he leads a superior lifestyle. Defendant also contends the judge erred by finding plaintiff has a "reduced lifestyle" post-divorce. However, the judge's finding is supported by sufficient credible evidence in the record.

A-2453-16T1

We therefore conclude the judge did not err by denying defendant's motion to reduce or terminate alimony. The judge made the required findings of fact, and her findings are supported by sufficient credible evidence in the record.

VII.

Defendant contends the trial court erred by denying his motion to reopen the judgment and supplement the record. Again, we disagree.

A court may grant a motion to reopen the judgment when it appears the new evidence the movant proffers "would probably have changed the result, that it was unobtainable by the exercise of due diligence for use at the trial, and that [it is] not merely cumulative." Quick Chek Food Stores v. Springfield, 83 N.J. 438, 445 (1980). "A trial court's determination not to reopen a judgment and take additional testimony is not to be disturbed except for a clear abuse" of its "broad judicial discretion." Ibid.

Here, defendant sought to reopen the judgment to present evidence that shortly after the second trial, plaintiff decided to join the Trump National Golf Club (TNGC) in Bedminster. He asserted that plaintiff paid $125,000 to join the club and thereafter would be responsible for annual dues and fees that could exceed $20,000.

31

In her decision after the second trial, the judge compared the lifestyles of the parties, and noted that defendant had continued to maintain a lifestyle that is indicative of a person of wealth. Among other things, defendant had continued his membership in the TNGC for himself and his new spouse, and for parties for A.C. The judge further found plaintiff had chosen to reduce her spending and that her lifestyle was "far below" defendant's lifestyle. The judge noted that at the time of the second trial, plaintiff was no longer a member of the TNGC.

On appeal, defendant argues that plaintiff's later decision to rejoin TNGC was evidence her lifestyle was comparable to his, and the court should have reopened the judgment to allow him to present that evidence. We are convinced, however, that the trial court did not err by denying defendant's motion to reopen the judgment and supplement the record. Defendant failed to show that the evidence regarding plaintiff's membership in the TNGC would have changed the result of the court's decision on his alimony motion.

## VIII.

We next consider defendant's arguments regarding attorneys' fees. As noted, after the first trial, the judge awarded plaintiff $300,000. After the second trial, the judge awarded plaintiff $50,000.

A-2453-16T1

Rule 5:3-5 provides that in a divorce action or an action involving equitable distribution or alimony, a court may, in its discretion, award attorney fees to any party. To determine the amount of the fee award, the court "should consider" the following factors:

> (1) the financial circumstances of the parties; (2) the ability of the parties to pay their own fees or to contribute to the fees of the other party; (3) the reasonableness and good faith of the positions advanced by the parties both during and prior to trial; (4) the extent of the fees incurred by both parties; (5) any fees previously awarded; (6) the amount of fees previously paid to counsel by each party; (7) the results obtained; (8) the degree to which fees were incurred to enforce existing orders or to compel discovery; and (9) any other factor bearing on the fairness of an award.
>
> [Ibid.]

A trial court's award of counsel fees "is discretionary, and will not be reversed except upon a showing of abuse of discretion." Barr v. Barr, 418 N.J. Super. 18, 46 (App. Div. 2011). As a result, an award of counsel fees will be disturbed only on rare occasions, Strahan, 402 N.J. Super. at 317, and only when "a decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Flagg v. Essex Cty. Prosecutor, 171 N.J. 561, 571 (2002) (quoting Achacoso-Sanchez v. Immigration & Naturalization Serv., 779 F.2d 1260, 1265 (7th Cir. 1985)).

A-2453-16T1

A.  Our Prior Opinion.

In our opinion on the appeals from the FJOD, we stated that we "[did] not find the judge's award of fees to necessarily be an abuse of discretion" and that "the bulk of the judge's fee opinion [was] without error." Carr, No. A-5558-10, at 38.  We stated, however, that it is "troubling" that the trial court appeared to have assessed fees against defendant in part because he was self-represented. Ibid.

We observed that self-represented litigants "often choose that path to avoid legal fees," and opined that to make such individuals pay the fees of an opposing party merely because they did not incur fees themselves was "unfair." Ibid.  We noted that in many cases pro se litigants "pose challenges to the other party and the court, and frequently make the trial longer and more complicated." Ibid.  Nevertheless, we found that allowing self-represented parties to be assessed fees based on their inexperience could potentially penalize every such litigant. Id. at 38-39.

We concluded that it is inappropriate to consider self-representation as a factor in the counsel fee analysis "unless the litigant utilizes his self-representation as a sword to unreasonably prolong the litigation, and thereby to inflict fees upon the other party." Id. at 39.  We observed that in this case, the

trial judge had not given specific examples of this type of conduct or explained how she determined $300,000 would compensate plaintiff for any wasted time. Id. at 39-40.

Accordingly, we remanded the matter and directed the trial court to provide "a fuller explanation of the basis of her counsel fee determination," including how the court weighed defendant's self-representation and whether plaintiff's counsel fees would have been less if defendant had been represented by an attorney. Ibid.

B. Decision on Fees For the First Trial.

On remand, the judge acknowledged she had placed "substantial weight" on the fact that defendant had represented himself at trial. She explained that all of the other factors under Rule 5:3-5 "pretty much balanced each other," but factor four, the extent of fees incurred by both parties, had "swayed [her] to conclude that there should be a modest counsel fee award" to plaintiff.

The judge stated that since both parties were represented by counsel during the third-party litigation, defendant could be entitled to an award of attorneys' fees related to that part of the litigation. The judge did not quantify what such an award would be, but stated that she "took that into account as a factor in considering the overall counsel fee award" for the entire case. She

indicated that in determining the award, she began with a calculation that plaintiff paid $1,330,409 more in fees than defendant paid.

The judge found that defendant should be responsible for $665,000, approximately half that amount. The judge decided, however, that because the third-party litigation had "no basis in New Jersey [l]aw," defendant should not be required to pay the entire $665,000. Moreover, the judge noted that defendant "probably ha[d] more cash assets than [plaintiff] and a higher earning capacity."

The judge reiterated her findings on each of the Rule 5:3-5 factors, observing once more that while plaintiff's positions on some issues were unreasonable, defendant was "obstructionist at almost every point of discovery," thereby prolonging the proceeding and forcing plaintiff to incur more counsel and expert fees than she would have incurred if he had cooperated from the start. The judge found that the award of $300,000 to plaintiff was fair and equitable.

C. Decision Regarding Fees For the Second Trial.

Following the second trial, plaintiff sought another $446,075.70 in attorneys' fees. The court again considered the factors in Rule 5:3-5. The judge found the issues presented in the second trial were complex and required plaintiff's attorney to work exclusively on this case, due to the volume of discovery and difficulty in obtaining documents and evidence.

The judge further found the rates charged by plaintiff's attorneys were in line with those of attorneys with comparable experience and reputation; that the time spent on the case was reasonable; and that the fees were properly charged on the basis of time spent, with hourly timekeeping.

The judge also noted that plaintiff had been awarded $300,000 in counsel fees for the first trial and had paid her attorneys more than $4 million during the ten years of this litigation. The judge noted defendant had paid attorneys approximately $1 million before he decided to represent himself.

In addition, the judge found the parties each had the ability to pay their own counsel fees. The judge added that plaintiff was "entirely unreasonable in her position that the parties should go to trial on the issue of valuation and equitable distribution of HM," because based on her own expert's report, the value of the business was "far less than what she was billed" in either expert or counsel fees to litigate the matter.

The judge found, however, that defendant behaved in "naïve if not obstructionist" ways during the proceedings. He had been "secretive" about discovery and insisted that neither expert had correctly valued the business. The judge characterized some of defendant's positions as "obtuse," and stated that he "repeatedly [sought] the same relief."

A-2453-16T1

The judge also noted that defendant's position regarding alimony was "particularly indefensible" and his arguments regarding his life insurance policies were "ridiculous" and made "in bad faith." Based on her consideration of all relevant factors, the judge awarded plaintiff $50,000 in attorneys' fees.

D. Defendant's Arguments.

On appeal, defendant argues that the trial court erred by reaffirming the award of counsel fees to plaintiff for the first trial because he chose to represent himself in that proceeding. He contends he should not be required to pay plaintiff's counsel fees because she was equally responsible for prolonging the litigation. He also contends the trial court failed to make certain findings, which he claims were required to support the decisions awarding plaintiff fees for both trials.

We are convinced, however, that the judge did not err by reaffirming the award for the first trial and awarding plaintiff counsel fees for the second trial. In both her remand opinion regarding the original fee award and her decision on the award of fees for the second trial, the judge addressed all of the Rule 5:3-5 factors in appropriate detail.

The judge did not base her $300,000 award for the first trial on defendant's self-representation. In her decision on remand, the judge referred to self-

representation, but this was only to explain that she had based her initial decision in part on this factor. The judge relied upon other, appropriate considerations and factors, in her decision on remand.

Defendant further argues that we should exercise original jurisdiction and award him $529,359 for attorney's fees he incurred in the third-party litigation. However, the record shows that the trial judge considered this expenditure when making her decision. Accordingly, there is no basis for the exercise of our original jurisdiction or further consideration of this claim.

IX.

Defendant challenges the trial court's decisions on tuition for A.C., his obligation to maintain life insurance, and certain monies seized by the Somerset County Probation Department (SCPD). We address each in turn.

A. Tuition for A.C.

Defendant contends the trial court abused its discretion by making him solely responsible for A.C.'s private school tuition. He argues that the parties should be equally responsible for these costs.

In the FJOD, the court awarded plaintiff $500 per month for child support. The judge ordered that defendant would be responsible for A.C.'s private school tuition and plaintiff responsible for her tutors, uniforms, equipment, and books.

At a hearing on June 30, 2014, the judge explained that in the FJOD, she had divided these costs between the parties because plaintiff had greater control over A.C.'s tutoring, school equipment, and clothing, and had made decisions about these matters during the marriage. The judge also stated that she had "estimated roughly that these expenses allocated to [plaintiff] would average out over time to approximate the tuition expense that [defendant was] paying."

During the second trial, plaintiff testified that A.C. was attending a private school for children with learning and psychological disabilities. Defendant stated the parties had agreed to A.C.'s enrollment in the school, which he found. Plaintiff stated A.C. would likely remain at this school through twelfth grade.

We are convinced the trial court did not abuse its discretion by ordering defendant to pay A.C.'s tuition costs, as provided in the FJOD. Defendant admitted during the second trial that currently, the child's school actually costs him nothing, and he agreed it is in A.C.'s best interests to attend this school. The record also shows that since defendant has greater income than plaintiff, he is better able to pay for tuition expenses should any arise in the future.

Moreover, plaintiff continues to be responsible for A.C.'s expenses for tutors, uniforms, and other school-related items, and plaintiff testified that the

child's tutoring needs are significant and ongoing. We conclude the trial court's decision on the child's tuition costs was not a mistaken exercise of discretion.

B.  Life Insurance.

Next, defendant argues that the trial court erred by ordering him to maintain a life insurance policy naming plaintiff and A.C. as beneficiaries with a death benefit sufficient to cover full payment of his alimony and child support obligations.

The FJOD required defendant to maintain "his current life insurance policy" with plaintiff named as beneficiary for seventy-five percent of the death benefit, and A.C. named as beneficiary for the remaining twenty-five percent. The record shows that during the marriage, defendant worked for Simpler Networks (SN), which purchased a $6 million life insurance policy with SN named as the beneficiary.

When defendant left SN, he maintained the policy and was able to name his own beneficiaries. In April 2007, defendant's beneficiary designations were seventy-five percent for A.C.'s trustee, and twenty-five percent for plaintiff. In May 2009, the court ordered defendant to maintain his current life insurance policy, and name plaintiff as the seventy-five percent beneficiary and A.C.'s trust as the beneficiary for the remaining twenty-five percent.

After the trial court entered the FJOD in 2011, defendant did not name plaintiff and A.C. as beneficiaries of the SN policy. Moreover, in 2014, defendant had SN transfer the policy. He named his new spouse as beneficiary of seventy-five percent of the death benefit, with A.C.'s trust the beneficiary of the remaining twenty-five percent.

Defendant testified that he viewed the court's May 2009 order as applying to his individual life insurance policy, which had a $300,000 death benefit. However, the judge found this testimony was "too self-serving to be anything but an intentional avoidance of the obligation to maintain [plaintiff] as a beneficiary on [the] large policy."

The judge found that defendant had never complied with the court's orders on life insurance. She required defendant to obtain a life insurance policy naming plaintiff and A.C. as beneficiaries in an amount sufficient to cover full payment of his alimony and child support obligations. The judge found that considering plaintiff's life expectancy, her expected alimony payout was $2,724,000.

In addition, the judge found defendant's anticipated child support payments would total $902,667. The judge found that the insurance policy's gross death benefit should cover $3,626,667, discounted to present value. The

judge ordered the parties to make the appropriate calculations, and required defendant to obtain a policy with the requisite death benefit.

On appeal, defendant argues that the judge should not have permitted plaintiff to raise a claim regarding life insurance in the second trial because she did not raise the issue in the earlier appeal. The contention is patently without merit. The FJOD ordered defendant to maintain his current life insurance policy, and plaintiff had no reason to raise any issue as to life insurance in the appeal from the FJOD.

Defendant also argues that the judge "testified" when she made her findings as to life insurance. In her opinion, the judge used a table in the Lawyers Diary to determine the parties' life expectancies and to calculate plaintiff's anticipated alimony award. The judge appropriately referred to these tables in making her findings of fact. See Schell v. Schell, 212 N.J. Super. 649, 657-58 (Ch. Div. 1986) (referencing Table of Life Expectancy in the Lawyers Diary and Manual).

Defendant further argues that the judge's decision on insurance was not based on sufficient credible evidence in the record. We disagree. The record supports the judge's finding that the life insurance policy referred to in the FJOD was the SN policy. Indeed, that was the only policy discussed during the first

trial. The judge did not err by ordering defendant to continue to obtain and maintain comparable insurance.

Defendant also contends the court erred by finding his testimony regarding the $300,000 insurance policy was not credible. Again, we disagree. We see no reason to second-guess the judge's credibility finding.

C. Seized Monies.

Defendant argues that despite an order entered in July 2014, which stayed enforcement of his financial obligations, the SCPD seized $17,397.25 in tax refunds, which the SCPD turned over to plaintiff. He also asserts plaintiff received an additional $21,000 from the SCPD despite orders staying enforcement of these contentions.

Defendant argues that this court should exercise its original jurisdiction, vacate the requirement that he pay his obligations through SCPD, and require plaintiff to return the seized funds. We decline to exercise our original jurisdiction to address this claim.

We have considered defendant's other arguments and conclude they lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed on the appeal and the cross-appeal.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2453-16T1